# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

COLLEGE LOAN CORPORATION, a
California Corporation,
                    *Plaintiff-Appellant,*

v.

SLM CORPORATION, a Delaware
Corporation; SALLIE MAE, INC., a
Delaware Corporation; SALLIE MAE
SERVICING, L.P., a Delaware Limited
Partnership; STUDENT LOAN
MARKETING ASSOCIATION, a
Government Sponsored Enterprise,
                    *Defendants-Appellees.*

No. 03-1867

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Senior District Judge.
(CA-02-1377-A)

Argued: September 28, 2004

Decided: January 31, 2005

Before WIDENER, KING, and DUNCAN, Circuit Judges.

---

Vacated and remanded by published opinion. Judge King wrote the
opinion, in which Judge Widener and Judge Duncan joined.

---

## COUNSEL

**ARGUED:** Steven John Routh, HOGAN & HARTSON, L.L.P.,
Washington, D.C., for Appellant. Joseph Paul Esposito, AKIN,

GUMP, STRAUSS, HAUER & FELD, L.L.P., Washington, D.C., for Appellees. **ON BRIEF:** Mark J. Brenner, COLLEGE LOAN COR-PORATION, San Diego, California; Saul Moskowitz, MOSKOWITZ & AUSTIN, L.L.C., Silver Spring, Maryland; Viet D. Dinh, BAN-CROFT ASSOCIATES, P.L.L.C., Washington, D.C.; H. Christopher Bartolomucci, Lorane F. Hebert, Chanel A. Reedy, HOGAN & HARTSON, L.L.P., Washington, D.C.; Emily M. Yinger, James K. Trefil, James S. Rixse, HOGAN & HARTSON, L.L.P., McLean, Vir-ginia, for Appellant. Robert S. Lavet, Deputy General Counsel, SAL-LIE MAE, INC., Reston, Virginia; Larry E. Tanenbaum, Matthew A. Rossi, Nicolas Jafarieh, Timothy J. Stockwell, AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P., Washington, D.C.; William E. Potts, Jr., AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P., McLean, Virginia, for Appellees.

---

## OPINION

KING, Circuit Judge:

This appeal arises from a dispute between two lenders of student loans, plaintiff College Loan Corporation ("College Loan"), and defendants SLM Corporation and several of its affiliates (sometimes collectively referred to as "Sallie Mae").[1] College Loan appeals from a judgment rendered against it in the Eastern District of Virginia, flowing from that court's pretrial rulings and a June 2003 jury verdict on certain of College Loan's state law claims against Sallie Mae. Col-lege Loan's primary contention is that the district court erred when it held that College Loan's state law claims were in certain aspects pre-empted by federal law — specifically, the Higher Education Act of 1965 (the "HEA"), 20 U.S.C. § 1001 *et seq.*, and regulations promul-gated thereunder — a ruling which, in effect, altered the elements of College Loan's state law claims. Because the district court erred in

---

[1]In addition to SLM Corporation, the Sallie Mae-affiliated defendants are corporate management and marketing subsidiary Sallie Mae, Inc.; servicing agent Sallie Mae Servicing, L.P.; and the government-sponsored lender Student Loan Marketing Association, now a wholly-owned subsidiary of SLM Corporation.

ruling that College Loan could not utilize violations of federal law to establish its state law claims against Sallie Mae, and in ruling that College Loan could rebut Sallie Mae's HEA-based defense (known as the Single Holder Rule) only by demonstrating that the defense was interposed in bad faith, we vacate the judgment and remand for further proceedings.

I.

A.

In order to properly assess the issues raised in this appeal, it is necessary to possess an elementary understanding of the HEA and the student loan programs that it established. The Federal Family Education Loan Program ("FFELP"), created by Title IV of the HEA and codified at 20 U.S.C. §§ 1071 to 1087-4 (2000), is the largest of the HEA's several student financial aid programs. The goal of FFELP is to provide access to post-secondary education for all students by helping families and students to finance higher education through multiple means: encouraging states and nonprofit private institutions and organizations to establish adequate loan insurance programs; providing a federal program of student loan insurance for certain students or lenders; paying a portion of the interest on federally-insured loans to qualified students; and guaranteeing a portion of certain insured loans. *See* 20 U.S.C. § 1071(a)(1) (2000); *see also, e.g.*, S. Rep. No. 102-204, at 6-9 (1991). Under FFELP, private lenders, such as College Loan, utilize their own funds to make loans to students attending post-secondary institutions and to the parents of such students. *See* 34 C.F.R. § 682.100 (2004). These loans are guaranteed by state or non-profit entities known as guaranty agencies, which are reinsured by the federal government. *See* 20 U.S.C. § 1078(a)-(c) (2000). The Secretary of Education (the "Secretary") administers FFELP and has promulgated appropriate regulations to carry out and enforce the FFELP program. *See id.* at § 1082(a)(1).

A consolidation loan is one of the several types of loans authorized by FFELP. *See* 20 U.S.C. § 1078-3 (2000). Such a loan pays off the outstanding balances on a borrower's existing FFELP loans and consolidates them into a single loan with a fixed interest rate. *Id.* Before a consolidation lender such as College Loan is entitled to process a

consolidation loan, it is required by the HEA to obtain a loan verification certificate ("LVC"), reflecting the payoff amount on each such outstanding loan, from the borrower's loan holders. The regulations require FFELP loan holders receiving LVC requests to complete and return LVCs to the would-be consolidation lender within ten business days. 34 C.F.R. § 682.209(j) (2004) (the "Ten Day Rule").[2] If certification of an LVC request is not possible, a loan holder is obliged to provide the requesting consolidation lender with an explanation of its inability to comply. *Id.* After a consolidation lender has received an LVC on each of a borrower's outstanding student loans, it may process a consolidation loan, pay off the other lenders, and become the holder of a consolidation loan. When consummated, a consolidation loan transfers a student borrower's educational debt from the portfolios of pre-existing loan holders to that of the consolidation lender.

Pursuant to the HEA, when a student borrower has multiple loans with multiple private lenders, another lender is entitled to offer the borrower a consolidation loan. 20 U.S.C. § 1078-3(b)(1)(A) (2000).[3]

---

[2]The full text of the Ten Day Rule provides:

Certification on loans to be repaid through consolidation. Within 10 business days after receiving a written request for a certification from a lender under § 682.206(f), a holder shall either provide the requesting lender the certification or, if it is unable to certify to the matters described in that paragraph, provide the requesting lender and the guarantor on the loan at issue with a written explanation of the reasons for its inability to provide the certification.

34 C.F.R. § 682.209(j) (2004).

[3]The text of 20 U.S.C. § 1078-3(b)(1)(A) sets forth the statutory aspect of the "Single Holder Rule," and reads as follows:

Any lender . . . who wishes to make consolidation loans under this section shall enter into an agreement with the Secretary or a guaranty agency which provides—

(A) that, in the case of all lenders described in subsection (a)(1), the lender will make a consolidation loan to an eligible borrower (on request of that borrower) only if the borrower certifies that the borrower has no other application pending for a loan under this section and (i) the lender holds an outstanding loan of that

However, if the borrower's multiple loans are all held by a single private lender, that lender is entitled to priority; a new lender cannot offer a consolidation loan to the borrower unless the single private lender declines to offer the borrower a consolidation loan, or unless the single private lender declines to offer the borrower a consolidation loan with income-sensitive repayment terms. *Id.*; *see also* 34 C.F.R. § 682.102(d) (2004).[4] Collectively, these requirements constitute what is known as the "Single Holder Rule." The HEA defines such a "holder" as "an eligible lender who owns a loan." 20 U.S.C. § 1085(i) (2000).

## B.

Turning to the facts and allegations underlying this dispute, plaintiff College Loan conducts a business involving the marketing and monitoring of FFELP consolidation loans. Defendant Sallie Mae, a

---

borrower which is selected by the borrower for consolidation under this section, except that this clause shall not apply in the case of a borrower with multiple holders of loans under this part [20 U.S.C.A. § 1071 *et seq.*], or (ii) the borrower certifies that the borrower has sought and has been unable to obtain a consolidation loan with income-sensitive repayment terms from the holders of the outstanding loans of that borrower (which are so selected for consolidation) . . . .

20 U.S.C. § 1078-3(b)(1)(A) (2000).

[4]The Single Holder Rule regulation, as promulgated by the Secretary at 34 C.F.R. § 682.102(d), provides as follows:

Consolidation loan application. To obtain a Consolidation loan, a borrower completes an application and submits it to the lender holding the borrower's FFEL Program loan or loans. If the borrower has multiple holders of FFEL Program loans, or if the borrower's single loan holder declines to make a Consolidation loan, or declines to make one with income-sensitive repayment terms, the borrower may submit the application to any lender participating in the Consolidation Loan Program . . . . If a lender decides to make the loan, the lender obtains a loan guarantee from a guaranty agency or the Secretary.

34 C.F.R. § 682.102(d) (2004).

significant primary student loan lender, also processes and services consolidation loan applications, and itself makes FFELP consolidation loans.

In May 2000, College Loan entered into a Master Loan Agreement with USA Group, Inc. and certain of its affiliates (the "Agreement"). Pursuant to the Agreement, USA Group agreed, *inter alia*, to act as College Loan's servicer in processing a portion of the loan applications made by College Loan's prospective consolidation borrowers. Among other provisions, USA Group agreed to "Guarantee Consolidation Loans that have been processed in accordance with the terms of the Consolidation Loan Program and for which Customer complies in all material respects with the Policies and the Act." Agreement at ¶ 1.12. USA Group also agreed to "provide administrative services for the continued maintenance of each Consolidation Loan Guaranteed as required by the Consolidation Loan Program and [the HEA]." *Id.* USA Group specifically certified that its consolidation loan servicing "shall comply in all respects with the Act." *Id.* at ¶ 4.26. Through these and other provisions of the Agreement, the obligations of the parties included compliance with the HEA.

In July 2000, two months after the Agreement was executed, SLM Corporation acquired certain aspects of the business of USA Group, including its loan servicing operations. These loan servicing operations were then assumed by SLM Corporation's subsidiary Sallie Mae Servicing, L.P., and Sallie Mae and College Loan thus became contractually obliged to work together in a lender-processor relationship. Because Sallie Mae affiliates continued to offer primary and consolidation loans, College Loan and Sallie Mae continued to directly compete as consolidation loan lenders.

College Loan contends that, when interest rates fell in July 2001 (and as demand for consolidation loans increased), Sallie Mae began to breach its obligations under the Agreement. Specifically, College Loan maintains that, after SLM Corporation's acquisition of USA Group, Sallie Mae Servicing failed to properly process more than 500 loan applications submitted to it by College Loan for processing. College Loan alleges that, in a scheme orchestrated by SLM Corporation, Sallie Mae Servicing diverted many of the College Loan consolidation applications to SLM-affiliated lenders, primarily the Student

Loan Marketing Association. College Loan contends that the diversion of these loan applications was improper, and that it was often accomplished without customer knowledge and in spite of the specific selection of College Loan by prospective borrowers as their consolidation lender. College Loan also claims that Sallie Mae Servicing sometimes used prospective borrower information from College Loan's confidential loan consolidation forms to contact prospective College Loan borrowers and solicit them to enter into consolidation loans with Sallie Mae rather than with College Loan. When confronted by College Loan in late 2001 about such improprieties, Sallie Mae terminated the Agreement.

College Loan contends that Sallie Mae also interfered with College Loan's business by failing to comply with the Ten Day Rule governing the handling of LVCs. College Loan maintains that Sallie Mae consistently refused to complete in a timely manner (or at all) LVCs on more than 10,000 students' loans held by Sallie Mae-affiliates which College Loan sought to consolidate. According to College Loan, Sallie Mae's pattern of non-compliance with the Ten Day Rule substantially increased in early 2002, shortly after Sallie Mae terminated the Agreement.

Sallie Mae defends these actions by asserting that most of the rejected College Loan consolidation loan applications violated the Single Holder Rule, and thus could not be consolidated. Importantly, Sallie Mae interprets the Single Holder Rule more expansively than does College Loan. In Sallie Mae's view, the Single Holder Rule applies not only to those borrowers whose loans are held by the same lender, but also (1) to borrowers whose loans are held by various Sallie Mae *affiliates*, though not by the same affiliate, and (2) to borrowers whose loans have been transferred to a securitization trust, where some residual financial interest is retained by a Sallie Mae affiliate. As a result, though College Loan required its consolidation applicants to certify, sometimes multiple times, that their loans were not held by the same lender or that they had been denied a consolidation loan by the applicable "single holder," Sallie Mae nonetheless rejected, pursuant to its broad view of the Single Holder Rule, a substantial number of College Loan's consolidation loan applications.

College Loan maintains that Sallie Mae's overly broad interpretation of the Single Holder Rule was part of what Sallie Mae deemed

a "consolidation counteroffensive," launched to stem the loss of its loan portfolios. For support, College Loan emphasizes, *inter alia*, that Sallie Mae's current interpretation of the Single Holder Rule is contrary to the position it previously espoused to the courts of the District of Columbia, and which that Circuit adopted in *Student Loan Marketing Ass'n v. Riley*, 104 F.3d 397 (D.C. Cir. 1997).

C.

On September 16, 2002, College Loan filed this civil action in the Eastern District of Virginia, which possessed diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). College Loan's initial complaint alleged claims for breach of contract against Sallie Mae Servicing; breach of fiduciary duty against Sallie Mae Servicing, and aiding and abetting such a breach against the other Sallie Mae defendants; conversion against Sallie Mae Servicing and the Student Loan Marketing Association; tortious interference with contractual relations against all the Sallie Mae defendants; and various other claims, including conspiracy, violation of the Virginia Business Conspiracy Statute, and violations of state and federal antitrust statutes. College Loan also sought a declaratory judgment that Sallie Mae's interpretation of the Single Holder Rule was incorrect. The complaint alleged that Sallie Mae's defense to these claims was that its actions were in conformity with the Single Holder Rule.

On October 21, 2001, Sallie Mae moved to dismiss College Loan's complaint under Rule 12(b)(6), for failure to state a claim on which relief could be granted. Sallie Mae principally contended that College Loan's claims constituted an impermissible effort to assert private rights of action under the HEA because, "[r]egardless of how College Loan might try to disguise or plead these claims, they all boil down to, and turn on, an alleged violation of the HEA" — that is, the Single Holder Rule. Because the courts have consistently held that no private right of action is available for violation of the HEA, *see, e.g.*, *Labickas v. Ark. State Univ.*, 78 F.3d 333, 334 (8th Cir. 1996) (finding no private right of action for student borrowers); *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1485 (9th Cir. 1995) (finding no private right of action for educational institutions); *L'ggrke v. Benkula*, 966 F.2d 1346, 1348 (10th Cir. 1992) (finding no private right of action

for student borrowers), Sallie Mae requested the district court to dismiss College Loan's complaint.

On December 10, 2002, the district court rendered its opinion on Sallie Mae's motion to dismiss. *See College Loan Corp. v. SLM Corp.*, No. 02-cv-1377-A (E.D. Va. Dec. 10, 2002) (granting in part and denying in part motion to dismiss) (the "Preemption Ruling"). The court noted Sallie Mae's "private cause of action" position, but characterized the real issue as whether the HEA preempted College Loan's state law claims. The court then concluded that the HEA impliedly preempts any state law action that utilizes the HEA to satisfy an element of the state law claim. Preemption Ruling at 8. The court declined to dismiss the majority of College Loan's HEA claims, however, observing that most of the claims could proceed independent of any reliance on the HEA or its regulations. The court dismissed without prejudice College Loan's conspiracy claim (Count VII) and its state and federal antitrust claims (Counts VIII and IX), and it dismissed with prejudice College Loan's claim for declaratory relief (Count X). College Loan thereafter filed an Amended Complaint, repleading certain claims and clarifying its position that its state law claims did not impermissibly rely on violations of the HEA or its regulations.

Shortly before trial, in the spring of 2003, the parties each filed motions that implicated the Preemption Ruling. First, College Loan moved to compel discovery of documents relating to consolidation loan applications that Sallie Mae Servicing had declined to process, relying on its view of the Single Holder Rule. In opposing College Loan's motion, Sallie Mae claimed that the Preemption Ruling meant that "no claims for consolidation applications or LVCs which were denied by Sallie Mae because of the single holder rule contained in the Higher Education Act should be before the court at this time." College Loan maintained, on the other hand, that documents relating to Sallie Mae's decision to rely on the Single Holder Rule were directly relevant to whether the Rule was being used by Sallie Mae as a pretext, and that such discovery was not precluded by the Preemption Ruling. College Loan also urged the court to allow it to contest whether Sallie Mae's invocation of the Single Holder Rule was in good faith, despite the fact that the court refused to allow the Single Holder Rule defense to be challenged on the merits. Otherwise, Col-

lege Loan maintained, Sallie Mae's mere assertion of the term "Single Holder Rule" would, under the Preemption Ruling, provide it with a complete, unexamined, and impenetrable defense. On April 9, 2003, the magistrate judge granted College Loan's motion to compel discovery in part, but denied the motion in part, and College Loan sought review in the district court.

Second, Sallie Mae filed a motion in limine with respect to the trial evidence, asking the district court to exclude evidence pertaining to approximately 662 of College Loan's loan applications and approximately 11,748 LVCs that Sallie Mae had rejected based on the Single Holder Rule. As in their response to College Loan's motion to compel, Sallie Mae maintained that evidence of consolidation loan applications not being processed on the basis of the Single Holder Rule was irrelevant to the issues at trial.

The district court denied both of these motions by its Memorandum Opinion of May 13, 2003. *See College Loan Corp. v. SLM Corp.*, No. 02-cv-1377-A (E.D. Va. May 13, 2003)(the "Discovery Phase Ruling"). The court therein clarified its Preemption Ruling, observing that it had held "that [it] lacked the power to adjudicate state common law claims, if the resolution of those claims would require [the district court] to interpret and apply the Single Holder Rule." Discovery Phase Ruling at 10. In the context of the issues at hand, this meant that College Loan could not "prove that [Sallie Mae's invocation of] the Single Holder Rule was a pretext by showing that Defendants' invocation of the Single Holder Rule was — on the merits of the Single Holder Rule — incorrect." *Id.* at 14. Instead, according to the court, the issue was "whether Defendants invoked the Single Holder Rule in good faith or whether they invoked it as part of some bad faith scheme to harm the Plaintiff." *Id.*

Sallie Mae thereafter moved for summary judgment on College Loan's remaining claims. On June 10, 2003, the district court denied summary judgment with respect to those four counts: breach of contract (Count I); breach of fiduciary duty (Count II); aiding and abetting a breach of fiduciary duty (Count III); and interference with prospective contractual relations (Count V). The court emphasized that, at trial, College Loan could defeat Sallie Mae's Single Holder Rule defense only by demonstrating that Sallie Mae's actions were

undertaken in bad faith or in willful disregard of that Rule. The trial of College Loan's four state law claims began on June 17, 2003, and the evidence closed on June 24, 2003. Those four claims went to the jury, which was instructed on the Single Holder Rule defense in the following terms:

> If you find that defendants' interpretation of the single-holder rule was undertaken in good faith and did not employ wrongful means, then you must find the defendants are not liable for rejecting or refusing to provide payoff information in response to LVCs . . . [or] for redirecting or declining to process loan applications if defendants' actions were based on their good faith interpretation of the rule. However, if you find that defendants' interpretation of the rule was not taken in good faith and that the rejection of the LVCs and/or loan application was based in bad faith or use of wrongful means, then you must find for the plaintiff.

So instructed, the jury, on June 25, 2003, returned a verdict in favor of Sallie Mae on each of the four claims. This appeal followed, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

On appeal, College Loan maintains that the district court erred when it concluded that College Loan's state law claims implicating the Single Holder Rule were preempted because the court's adjudication of those claims would disrupt "uniformity" in the administration of the HEA and create an "obstacle" to achieving the congressional objectives of the HEA. In order to resolve this dispute, we must assess whether the Preemption Ruling was legally sound, a question of law that we review de novo. *See Cox v. Shalala*, 112 F.3d 151, 153 (4th Cir. 1997).

Next, College Loan contends that the court erred in concluding in its Discovery Phase Ruling that the HEA precluded College Loan from defeating Sallie Mae's Single Holder Rule defense by contesting its interpretation of that Rule, instead imposing a "bad faith" element on College Loan's state law claims. We generally review a trial court's discovery rulings and jury instructions for abuse of discretion.

*Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 929 (4th Cir. 1995) (discovery rulings); *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 432 (4th Cir. 2004)(jury instructions). And a trial court "by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996) (citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)). Even if a jury was erroneously instructed, however, we will not set aside a resulting verdict unless the erroneous instruction "seriously prejudiced the challenging party's case." *Johnson*, 357 F.3d at 432 (internal quotation omitted).

## III.

The Supremacy Clause of the Constitution makes federal law "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. As a result, federal statutes and regulations properly enacted and promulgated "can nullify conflicting state or local actions." *Nat'l Home Equity Mortgage Ass'n v. Face*, 239 F.3d 633, 637 (4th Cir. 2001) (quoting *Worm v. Am. Cyanide Co.*, 970 F.2d 1301, 1304-05 (4th Cir. 1992)). Pursuant to the applicable principles, state law is preempted under the Supremacy Clause in three circumstances: (1) when Congress has clearly expressed an intention to do so ("express preemption"); (2) when Congress has clearly intended, by legislating comprehensively, to occupy an entire field of regulation ("field preemption"); and (3) when a state law conflicts with federal law ("conflict preemption"). *S. Blasting Servs., Inc. v. Wilkes County, N.C.*, 288 F.3d 584, 590 (4th Cir. 2002). The doctrine of express preemption has no application here (as the parties agree), because the HEA makes no mention of preempting state tort and contract claims. The parties also agree that the second of the preemption doctrines, that of field preemption, has no application to this dispute.[5]

---

[5]Certain sections of the HEA expressly preempt certain state law claims. *See, e.g.*, 20 U.S.C. § 1078(d) (2000) (displacing state usury laws); *id.* at § 1091a(a) (displacing state statutes of limitations); *id.* at § 1091a(b) (displacing state infancy defenses); *id.* at § 1099 (displacing state disclosure requirements). Because Congress deemed it necessary to specifically preempt certain state laws, it is clear that Congress could not have intended the HEA to so "occupy the field" that it would automatically preempt *all* state laws. *See Cipollone v. Liggett Group, Inc.*, 505

In making its rulings in this proceeding, the district court relied on the doctrine of conflict preemption, which may arise in two circumstances: from a direct conflict between state and federal law, such that compliance with both is impossible (called "direct conflict"), or because a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" (called "obstacle preemption"). *S. Blasting*, 288 F.3d at 591 (quoting *Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712 (1985)). A state law may pose an obstacle to federal purposes by interfering with the accomplishment of Congress's actual objectives, or by interfering with the *methods* that Congress selected for meeting those legislative goals. *Gade v. Nat'l Solid Waste Mgmt. Assoc.*, 505 U.S. 88, 103 (1992).

By its Preemption Ruling, the district court decided that, even though there was no direct conflict between the HEA and College Loan's state law claims, permitting College Loan to utilize violations of the HEA and its regulations to support those claims against Sallie Mae would pose an "obstacle" to the accomplishment of Congress's objectives in enacting the HEA.[6] The court found such an obstacle present primarily because the Secretary has created a "detailed structure of regulations" for implementing the HEA. As a result, the court concluded:

---

U.S. 504, 517 (1992) ("Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted."); *accord Keams v. Tempe Tech. Inst., Inc.*, 39 F.3d 222, 225 (9th Cir. 1994) (holding that express provisions in the HEA which preempt state law necessarily "imply that Congress intentionally did not preempt state law generally, or in respects other than those it addressed").

[6]Although the district court, in making its Preemption Ruling, characterized the type of preemption as "obstacle preemption," the concept relied on by the court resembles "field preemption," which arises when Congress has regulated so pervasively in an area that there is no room for state law. Our analysis reveals that the courts addressing the issue have consistently concluded that the HEA does not occupy the field of higher education loans. *See, e.g.*, *Armstrong v. Accrediting Council*, 168 F.3d 1362, 1369 (D.C. Cir. 1999); *Keams*, 39 F.3d at 225-26; *Morgan v. Markerdowne Corp.*, 976 F. Supp. 301, 318 (D.N.J. 1997).

> Congress intended to create a uniform remedial framework
> for lenders and servicers who violate the terms of the
> FFELP, by encouraging comprehensive administrative
> enforcement as a means of resolving disputes between lend-
> ers and servicers. However, this intent is compromised when
> the remedies are administered according to the ebbs and
> flows of state law.

Preemption Ruling at 8 (internal quotations omitted). The district
court clarified this conclusion several months later, in its Discovery
Phase Ruling. In so doing, the court explained that it could not adjudi-
cate the merits of asserted violations of the HEA and its regulations
because exposing regulated FFELP lenders to such a remedy would
disrupt the uniformity of the student loan business that Congress
sought when it enacted the HEA. Discovery Phase Ruling at 10. In
the context of College Loan's claims, this meant that College Loan
could not defeat the Single Holder Rule defense by showing that Sal-
lie Mae's interpretation of the rule was legally incorrect. Discovery
Phase Ruling at 13-14. However, the court ruled that it would permit
College Loan to rebut the Single Holder Rule defense by showing that
Sallie Mae had invoked it in bad faith. *Id.*

A.

On appeal, College Loan first contends that the district court erred
when it ruled that College Loan was not entitled to utilize evidence
that SLM had violated the HEA and its regulations to satisfy elements
of its state law claims. In analyzing whether a state law is preempted
by a federal statute or regulation, our "starting presumption," is that
"Congress does not intend to supplant state law." *Coyne Delany Co.
v. Selman*, 98 F.3d 1457, 1467 (4th Cir. 1996) (quoting *NY State Con-
ference of Blue Cross Blue Shield Plans v. Travelers*, 514 U.S. 645,
654-55 (1995)); *see also S. Blasting*, 288 F.3d at 589-90. As we
explained in *Abbot v. American Cyanamid Co.*, "the presumption
against preemption is even stronger against preemption of state reme-
dies, like tort recoveries, when no federal remedy exists." 844 F.2d
1108, 1112 (4th Cir. 1988)(citing *Silkwood v. Kerr-McGee Corp.*, 464
U.S. 238, 251 (1984)).

We are unable to confirm that the creation of "uniformity," a goal relied on by the district court in its Preemption Ruling, was actually an important goal of the HEA. The purposes of FFELP are spelled out in § 1071(a)(1) of the HEA: they include encouraging states and non-profit organizations to make loans to students for post-secondary education, providing loans to those students who might not otherwise have access to funds, paying a portion of the interest accruing on student loans, and guaranteeing lenders against losses. 20 U.S.C. § 1071(a)(1) (2000); *see also Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1127-30 (11th Cir. 2004) (describing FFELP goals, and concluding that such goals did not bar consolidation debtor's claim against lender under Florida debt collection act). Importantly, neither the district court nor the parties have explained how these statutory purposes would be compromised by a lender, such as College Loan, pursuing breach of contract or tort claims against other lenders or servicers.[7]

The fact that the Secretary has promulgated extensive regulations pursuant to the HEA does not, standing alone, persuade us to the contrary. The existence of comprehensive federal regulations that fail to occupy the regulatory field do not, by their mere existence, preempt non-conflicting state law. *See Abbot*, 844 F.2d at 1112. Instead, as the Supreme Court has observed, "[t]o infer pre-emption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive." *Hillsborough County*, 471 U.S. at 717. And the Court has "observed repeatedly that pre-emption is ordinarily not to be implied absent an 'actual conflict.'" *English v. Gen. Elec. Co.*, 496 U.S. 72, 90 (1990) (internal citations omitted). The Court's mandate thus seems clear: we should not "seek[ ] out conflicts between state and federal regulation where none clearly exists." *Id.* at

---

[7]Although the district court, in making its Preemption Ruling, relied on the Ninth Circuit's decision in *Brannan v. United Student Aid Funds Inc.*, 94 F.3d 1260, 1263 (9th Cir. 1996), that case is distinguishable. There, the court deferred to a Notice of Interpretation issued by the Secretary, opining that any state law conflicting with the collection procedures established by the Act is preempted. No such interpretation is present here. Furthermore, the Eleventh Circuit in *Cliff*, addressing the same collection issue, declined to so interpret the Notice. 363 F.3d at 1127-30.

90 (quoting *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 446 (1960)).

Nor does the fact that only the Secretary is authorized to enforce the HEA, *see, e.g.*, *McCulloch v. PNC Bank, Inc.*, 298 F.3d 1217, 1221 (11th Cir. 2002) (listing authorities), compel the conclusion that College Loan's pursuit of its state law claims, relying in part on violations of the HEA or its regulations, will obstruct the federal scheme.[8] To the contrary, the Supreme Court (and this Court as well) has recognized that the availability of a state law claim is even *more* important in an area where no federal private right of action exists. As we observed in *Worm v. American Cyanide Co.*, "it would be difficult to believe that Congress would without comment, remove all means of recourse for those injured by illegal conduct." 970 F.2d 1301, 1308 (4th Cir. 1992) (quoting *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 251 (1984)), *on appeal after remand*, 5 F.3d 744 (4th Cir. 1993) ("*Worm I*"). This point is particularly obvious in relation to College Loan's contract claim. As parties to the Agreement, College Loan and Sallie Mae (through assumption of USA Group's duties) voluntarily included federal standards (the HEA) in their bargained-for private contractual arrangement. Both *expressly agreed* to comply with the HEA. In that context, Sallie Mae's argument that enforcement of the Agreement's terms is preempted by the HEA boils down to a contention that it was free to enter into a contract that invoked a federal standard as the indicator of compliance, then to proceed to breach its duties thereunder and to shield its breach by pleading preemption. In this case at least, federal supremacy does not mandate such a result. *Cf. Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 526 n.24 (1992) (interpreting statutory preemption clause and concluding that voluntarily undertaken obligations are not "imposed" by state law, but "imposed" by contracting party upon itself).

---

[8]It seems settled that private parties are entitled to sue to redress violations of other aspects of the HEA. *See Cliff*, 363 F.3d at 1127-30 (allowing suit by debtor against consolidation lender under both Federal Debt Collection Practices Act and Florida Consumer Collection Practices Act); *Brannan*, 94 F.3d at 1266 (finding state debt collection practices act claim preempted but allowing FDCPA action); *Keams*, 39 F.3d at 226 (allowing state tort suits against accrediting agencies).

Furthermore, the courts have generally authorized state tort claims to be pursued in areas where the federal government has regulated, even when such claims are in some manner premised on violations of federal regulations. *See, e.g.*, *English*, 496 U.S. at 85 (authorizing nuclear facility employee to assert intentional infliction of emotional distress claim against employer based on perceived violations of nuclear-safety standards established by Energy Reorganization Act, despite existence of statutory remedies). In fact, the states are sometimes entitled to impose more stringent common law and statutory requirements in areas regulated by federal law, so long as such requirements are not incompatible with those established under federal law. *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 498 (1987) (concluding that Clean Water Act precludes only incompatible state standards). As a result, the existence of the Secretary's exclusive authority to enforce the HEA and its regulations does not, standing alone, mandate the conclusion that a state law claim which relies on HEA violations for support "obstructs" the federal scheme.

For these reasons, the Preemption Ruling, as clarified by the Discovery Phase Ruling, was erroneous.[9] The HEA and its regulations do

---

[9]Sallie Mae maintains, in the alternative, that the district court's Preemption Ruling was nonetheless correct because College Loan is not entitled to pursue an HEA private action in the guise of a state law claim. However, the lack of a statutory private right of action does not, in and of itself, bar a plaintiff from relying on violations of that statute as evidence supporting a state law claim. *See Medatronics v. Lohr*, 518 U.S. 470, 487 (1996) (rejecting as "implausible" contention that lack of private right of action precluded state common law remedies). Furthermore, we have specifically recognized that, absent preemption, an injured plaintiff may sue under state law seeking redress for a violation of a federal regulation. *See Worm I*, 970 F.2d at 1308 (observing that "if the Maryland common law recognized a tort based on the breach of a federally imposed standard, the [plaintiff] would be able to pursue that claim without conflicting with federal law"); *see also Lowe v. Sporicidin Int'l*, 47 F.3d 124, 128 (4th Cir. 1995) (reaffirming rationale of *Worm I*). While the Ten Day Rule and the Single Holder Rule are intertwined with the questions being litigated here, College Loan alleges garden-variety contract and tort claims, supported by violations of the Single Holder Rule and the Ten Day Rule, and responses to Sallie Mae's anticipated Single Holder Rule defense. In these circumstances, Sallie Mae's private right of action rationale is not applicable.

not preempt the state law claims which College Loan seeks to pursue in this proceeding. To the extent that state law principles authorize College Loan to rely on violations of the Single Holder Rule or the Ten Day Rule in proving its state law claims, College Loan is not precluded by the HEA and the Supremacy Clause from so doing.

## B.

Finally, College Loan maintains that the Preemption Ruling unfairly tainted the trial of its state law claims against Sallie Mae because College Loan was not permitted to show that Sallie Mae's interpretation of the Single Holder Rule was incorrect.[10] Instead, the court adopted and instructed the jury on its "bad faith" standard, which authorized College Loan to defeat Sallie Mae's Single Holder Rule defense only by showing that the defense was interposed in bad faith. This ruling flowed directly from the district court's erroneous conclusion, set forth explicitly in the Discovery Phase Ruling and

---

[10]Sallie Mae contends that College Loan waived any objection to the district court's "bad faith" requirement. On the contrary, College Loan resisted Sallie Mae's Rule 12(b)(6) motion to dismiss, which asserted that College Loan was seeking to pursue impermissible private actions under the HEA, contending that a preemption assessment should be conducted and explaining that its state law claims were not preempted by federal law. College Loan lost that contention, and it then proceeded to litigate its state law claims within the confines of the rulings of the district court. Part of that effort was an attempt to cabin the Preemption Ruling by contending that the Single Holder Rule defense was interposed by Sallie Mae in bad faith, even if the court would not permit College Loan to contest that defense on its merits. That College Loan litigated in that manner does not constitute a waiver of the error made in the Preemption and Discovery Phase Rulings.

Nor does College Loan's failure to specifically object to the instructions on the bad faith issue waive the position it had already unsuccessfully presented to the district court. The trial court's instruction on bad faith was simply its application of the Preemption Ruling at trial, as the court recognized in its Discovery Phase Ruling. As a result, when the jury was instructed, the court was "fully aware of the plaintiff's position" on the preemption issue, and it "had obviously considered and rejected that position." *City of Richmond v. Madison Mgmt. Group, Inc.*, 918 F.2d 438, 453 (4th Cir. 1990) (internal quotations omitted).

embodied in the jury instructions, that it could not rule on the correct interpretation of the Single Holder Rule.[11]

Furthermore, the imposition of the bad faith standard onto College Loan's state law claims obviously prejudiced the pursuit of those claims. None of the claims tried to the jury — breach of contract, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, or tortious interference with contractual relations — had "bad faith" as an element.[12] Indeed, the court's instruction on the state of mind necessary to justify a jury award of *punitive* damages to College Loan was less onerous than the bad faith requirement it imposed on College Loan's compensatory damages claims, allowing the jury to award punitive damages if Sallie Mae's conduct was found to be with either a "bad motive" *or* with "reckless indifference." The bad faith standard thus engrafted an erroneous additional element onto each of College Loan's four state law claims. There is a reasonable probability that this additional element affected the jury's verdict, "seriously prejudicing" College Loan's case, *Johnson*, 357 F.3d at 432, and reversal of the judgment is thus warranted.[13]

## IV.

Pursuant to the foregoing, we vacate the judgment of the district court, reverse its Preemption Ruling, and remand for such other and further proceedings as may be warranted.

*VACATED AND REMANDED*

---

[11]On remand, the district court may, of course (if it concludes that such a determination is procedurally proper) credit Sallie Mae's interpretation of the Single Holder Rule, in which event some or all of College Loan's claims may be disposed of on summary judgment. College Loan is entitled, however, to have the district court address whether Sallie Mae's interpretation and application of that Rule was legally sound.

[12]The district court, by its pretrial rulings, eliminated several other of College Loan's original claims in their entirety. We do not decide which, if any, of those claims should be reinstated, and leave that assessment to the sound judgment of the district court.

[13]Because the district court's bad faith ruling was erroneous, it is unnecessary for us to address the court's rulings on evidence proffered by College Loan pursuant to that standard.