**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 22-1248

MARK ANTHONY GUTHRIE,

Plaintiff – Appellant,

v.

PHH MORTGAGE CORPORATION,

Defendant – Appellee,

and

TRANS UNION, LLC; EQUIFAX, INC.; EQUIFAX INFORMATION SERVICES, LLC; EXPERIAN INFORMATION SOLUTIONS, INC.,

Defendants.

------------------------------

ELECTRONIC PRIVACY INFORMATION CENTER; THE NATIONAL CONSUMER LAW CENTER,

Amici Supporting Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Wilmington. Terrence W. Boyle, District Judge.  (7:20−cv−00043−BO)

Argued:  May 4, 2023                    Decided:  August 18, 2023

Before DIAZ, Chief Judge, and WYNN and QUATTLEBAUM, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion. Judge Quattlebaum wrote the opinion, in which Chief Judge Diaz joined and Judge Wynn wrote an opinion concurring in part and dissenting in part.

_____

**ARGUED:** Matthew William Buckmiller, BUCKMILLER, BOYETTE & FROST, PLLC, Raleigh, North Carolina, for Appellant. John Curtis Lynch, TROUTMAN PEPPER HAMILTON SANDERS LLP, Virginia Beach, Virginia, for Appellee. **ON BRIEF:** Blake Boyette, BUCKMILLER, BOYETTE & FROST, PLLC, Raleigh, North Carolina, for Appellant. Ethan G. Ostroff, Carter R. Nichols, Virginia Beach, Virginia, Elizabeth Holt Andrews, TROUTMAN PEPPER HAMILTON SANDERS LLP, Raleigh, North Carolina, for Appellee. Megan Iorio, Christopher Frascella, ELECTRONIC PRIVACY INFORMATION CENTER, Washington, D.C., for Amici Curiae.

_____

2

QUATTLEBAUM, Circuit Judge:

Mark Anthony Guthrie appeals the district court's grant of summary judgment to PHH Mortgage Corporation on numerous federal and state law claims. A complicated set of facts underlies these claims—complicated enough to make an excellent hypothetical for a law school exam. For our purposes though, this appeal can be boiled down to two issues. First, does the Bankruptcy Code preempt state law causes of action for a creditor's improper collection efforts related to debt that has been discharged in bankruptcy? Second, are there genuine disputes of material fact with respect to Guthrie's federal and state claims?

I.

Guthrie filed for Chapter 13 bankruptcy and was granted a discharge order in 2016. PHH, for its part, holds an interest in a property for which Guthrie's personal liability was discharged in the bankruptcy proceeding. Guthrie sued PHH[1] for improper collection attempts on the discharged debt, as well as misreporting his credit status. We begin by summarizing Guthrie's bankruptcy proceedings and the subsequent district court proceedings.

---

[1] Guthrie also sued TransUnion, Equifax and Experian, but he resolved his claims against those parties out of court and voluntarily dismissed them from the case.

3

A.

In 2009, Guthrie and his then-wife, Tonia, took out a loan to purchase a home (the "Property") in Jacksonville, North Carolina. Guthrie and Tonia subsequently separated and, eventually, divorced. Following the separation, in April 2011, Guthrie filed for Chapter 13 bankruptcy. Both Guthrie and Tonia's names are listed on the deed for the Property, and Tonia's name remains on the loan. But Tonia did not and has not ever filed for bankruptcy.

In August 2011, after the divorce, the United States Bankruptcy Court for the Eastern District of North Carolina entered an order confirming Guthrie's Chapter 13 Bankruptcy Plan. Under the plan, Guthrie had to make 60 monthly payments of $1,825 and would continue living at the Property with his and Tonia's two children.

But in January 2013, Guthrie—a Marine Corps officer and pilot—and his children relocated from the Property to base housing. In connection with that relocation, Guthrie moved the bankruptcy court to allow surrender of the Property and modification of the Plan. The court granted the motion, which also reduced his overall repayment obligations to 21 monthly payments of $1,825 followed by 39 monthly payments of $825.

In May 2016, after Guthrie had made all plan repayments, the bankruptcy court issued an order that discharged Guthrie's obligations for the debt. Discharging an obligation is bankruptcy-speak for ruling Guthrie had no further obligation for the debt. 11 U.S.C. § 1328. His bankruptcy case was closed in August 2016.

The discharge order left an unusual situation concerning the Property and the debt on it. Because PHH did not foreclose on the Property after Guthrie surrendered it in 2013,

4

both Guthrie and Tonia's names remained on the deed. Guthrie—one joint owner—had received a bankruptcy discharge order on the debt. Tonia—the other joint owner—was still obligated on the debt, never having filed for bankruptcy.

B.

Following a long chain of assignments, in May 2013, PHH obtained its interest in the Property.[2] Guthrie sued PHH in 2020, asserting two general categories of improper actions regarding the debt—(1) improperly contacting him and attempting to collect the debt and (2) misreporting of his credit status.[3]

Guthrie alleges that, beginning around November 2013, PHH "began harassing [him] by placing collection telephone calls to [him] in connection with the Loan on a weekly basis," an average of 1 to 3 times per week, persisting through January 2016. J.A. 729. He says that he repeatedly asked PHH to stop contacting him and informed its employees that he was no longer liable on the loan. According to Guthrie, he told them to "contact his ex-wife for payment." J.A. 701.

Guthrie enlisted the help of his bankruptcy attorney, who sent PHH "at least two separate warning letters" in 2014, stating that PHH could not collect or attempt to collect

---

[2] The original loan was an adjustable rate note that Guthrie and Tonia took out with Gateway Funding Diversified Mortgage Services L.P. In November 2011, Gateway assigned its interest in the Property to GMAC Mortgage, LLC. Then, in May 2013, GMAC assigned its interest in the Property to Ocwen Loan Servicing. Finally, Ocwen merged with PHH in January 2019. For simplicity, we refer to Ocwen as PHH throughout, given that PHH and Ocwen are the same entity for purposes of Guthrie's lawsuit.

[3] Guthrie sued in North Carolina state court. PHH removed the action to the United States District Court for the Eastern District of North Carolina.

5

amounts owed on the loan from Guthrie. J.A. 702. PHH responded, acknowledging that Guthrie was represented by counsel and stated that "all communications including verbal, mail, and email" to Guthrie would cease and would instead be forwarded directly to Guthrie's attorney. J.A. 757. Despite this, Guthrie alleges that PHH continued to contact him directly until 2020.

In May 2016, the bankruptcy court sent the discharge order to PHH. When a debt is discharged, the bankruptcy court enters a discharge injunction that prevents creditors from seeking to obtain payment on that debt. 11 U.S.C. § 524(a)(2) ("A discharge in a case under this title [] operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived[.]"). As the discharge order explained, "[c]reditors cannot contact the debtors by mail, phone, or otherwise in any attempt to collect the [discharged] debt personally." J.A. 760. It also explained that "[c]reditors who violate th[e] order can be required to pay debtors damages and attorney's fees." J.A. 760.

Despite the discharge injunction, Guthrie alleges that PHH continued to contact him about the loan through telephone calls and mail. Guthrie also alleges that PHH misreported his credit status by reporting that, despite the discharge, he remained liable on the loan, was in default under the terms of the loan and was more than 120 days delinquent on the loan. He alleges that PHH's actions caused physical, emotional and professional damages, as well as prevented him from obtaining favorable credit.

Guthrie brought ten claims against PHH based on these actions for violations of various state and federal laws. Following discovery, the parties filed cross-motions for summary judgment on all claims. The district court granted PHH's motion in full and denied Guthrie's.

Guthrie timely appealed but addressed just five of his claims.[4] Three are state law claims—negligent infliction of emotional distress ("NIED"), intentional infliction of emotional distress ("IIED") and violation of the North Carolina Debt Collection Act ("NCDCA"). Two are federal—violations of the Fair Credit Reporting Act ("FCRA") and the Telephone Consumer Protection Act ("TCPA").[5]

Guthrie's appeal primarily involves three holdings by the district court. First, the court held that, to the extent they were premised on improper debt collection attempts, the Bankruptcy Code preempted Guthrie's NIED, IIED and his NCDCA claims (collectively, "state law claims").[6] Second, it held that, to the extent it was not otherwise preempted, there was no genuine dispute of material fact as to Guthrie's NCDCA claim.[7] Finally, it held there was no genuine dispute of material fact as to his FCRA and TCPA claims.

---

[4] We have jurisdiction under 28 U.S.C. § 1291.

[5] Guthrie also sued under common law negligence, North Carolina's Unfair and Deceptive Trade Practices Act and Collection Agency Act and the federal Real Estate Settlement Procedures Act and Fair Debt Collection Practices Act. He does not appeal summary judgment on those claims.

[6] It also held that, to the extent Guthrie's state law claims were premised on misreporting his credit status, the FCRA preempted his claims. Guthrie does not appeal this holding.

[7] The district court did not address the merits of Guthrie's NIED and IIED claims.

7

II.

We begin by addressing preemption[8] before turning to whether Guthrie has established a genuine dispute of material fact on his NCDCA, FCRA and TCPA claims.

A.

The Supremacy Clause of the Constitution dictates that "the Laws of the United States" are "the supreme Law of the Land." U.S. Const. art. VI. Practically speaking, this means that federal law preempts—or bars—claims under state law that either interfere with or are contrary to federal law. *S. Blasting Servs., Inc. v. Wilkes Cnty.*, 288 F.3d 584, 589 (4th Cir. 2002).

But we must not presume federal law preempts state law. In fact, any analysis of preemption begins "with the basic assumption that Congress did not intend to displace state law." *Id.* (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)). This assumption can be overcome in one of three ways. First, Congress may explicitly state an intention to preempt certain state laws. *Id.* at 590. This is called express preemption. Second, "federal law [may] so thoroughly occup[y] a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it." *Id.* (quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992)). This is called field preemption. Finally, "compliance with both federal and state regulations [may be] a physical impossibility," which creates "direct conflict" preemption. *Id.* (quoting *Hillsborough Cnty. v. Automated*

---

[8] We review whether state law is preempted by federal law de novo. *Decohen v. Cap. One, N.A.*, 703 F.3d 216, 222 (4th Cir. 2012).

*Med. Lab'ys., Inc.*, 471 U.S. 707, 713 (1985)). Similarly, "state law [may] stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," which is known as "obstacle preemption." *Id.* Direct conflict preemption and obstacle preemption fall under the broader category of conflict preemption.

Guthrie's state law claims that remain on appeal sound in consumer protection and stem from alleged improper contact and collection attempts. Adopting PHH's arguments, the district court held that, because these claims "require[d] proof of violation of the discharge injunction," they were preempted. J.A. 1606. It reasoned that, for any improper debt collection contact that "would not be wrongful absent the existence of [the discharge injunction] imposed by the Bankruptcy Code," Guthrie is limited to the Code's remedies. J.A. 1607. Those remedies, the district court explained, were not expressly provided for in the Bankruptcy Code. But a bankruptcy court may exercise its power under 11 U.S.C. § 105 "to hold a creditor in civil contempt, and impose contempt sanctions, for violating the discharge injunction." J.A. 1606 (quoting *In re Williams*, 612 B.R. 682, 690 (Bankr. M.D.N.C. 2020)).

The district court did not specify under which theory of preemption—express, field or conflict—it based its decision. Express preemption does not apply, as the Bankruptcy Code provisions pertaining to chapter 13 bankruptcy and discharge injunctions do not include language preempting related state law. 11 U.S.C. §§ 524, 1301–1330. And, on appeal, PHH explicitly waived any argument about field preemption. That leaves conflict preemption as the only potential viable theory. Thus, we are left with the following

9

question: does conflict preemption bar Guthrie's state law claims for improper debt collection attempts, which hinge on PHH's violation of the discharge injunction?

Recall that conflict preemption has two subsets—direct conflict preemption and obstacle preemption. Under direct conflict preemption, we ask whether compliance with federal and state laws is impossible. *S. Blasting Servs., Inc.*, 288 F.3d at 591. The answer to that question is easy—it is not. A creditor can comply with both the discharge injunction and the state law on which Guthrie's claims are based by not seeking to improperly collect debts discharged in bankruptcy. So, direct conflict preemption does not apply.

Under obstacle preemption, we ask whether Guthrie's state law claims "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting the Bankruptcy Code. *Id.* at 590. While trickier, the answer to the obstacle preemption question is also no.

10

1.

Neither our court nor our sister circuits has addressed this issue,[9] and district and bankruptcy courts that have done so are split.[10] So we turn to the basic principles of obstacle preemption. "Determining whether a state law 'stands as an obstacle' to federal law is a two-step process. First, we determine Congress's 'significant objectives' in passing the federal law. We then turn to whether the state law stands 'as an obstacle to the accomplishment of a significant federal regulatory objective.'" *Va. Uranium, Inc. v. Warren*, 848 F.3d 590, 599 (4th Cir. 2017) (quoting *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 330 (2011)) (cleaned up), *aff'd*, 139 S. Ct. 1894 (2019).

---

[9] Some of our sister circuits have addressed preemption in analogous contexts. For example, in *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 426 (6th Cir. 2000), the Sixth Circuit held that the automatic stay provisions of the Bankruptcy Code preempted state law claims that presupposed violations of those same provisions. The Sixth Circuit relied on both obstacle and field preemption in reaching that conclusion. *Id.* at 426. However, the automatic stay is in place during a bankruptcy proceeding, while the discharge injunction is entered after it has been closed. As such, we do not find *Pertuso* persuasive. And the First Circuit has held that state claims for unjust enrichment involving a discharge injunction are preempted based on field preemption. *Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 447 (1st Cir. 2000). But because PHH waived that issue, we do not address it here.

[10] For example, in *In re Waggett*, No. 09-4152-8-SWH, 2015 WL 1384087 (Bankr. E.D.N.C. Mar. 23, 2015), the bankruptcy court held that state law consumer protection claims based on efforts taken after the close of the bankruptcy case to collect debts covered by the bankruptcy discharge were not preempted. It reasoned that "[t]here is little risk that allowing the state law claims to go forward will disrupt the uniform application of the bankruptcy laws or contravene congressional purpose." *Id.* at *8. In contrast, in *In re Johnston*, 362 B.R. 730, 737 (Bankr. N.D.W. Va. 2007), the bankruptcy court held that "state law causes of action that would allow a debtor to collect damages for a violation of the discharge injunction are foreclosed by the remedies provided" in the Bankruptcy Code.

11

As to the federal objectives, the Supreme Court has explained that "[t]he principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor.'" *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007) (citation omitted).

However, the Bankruptcy Code is not "focused on the unadulterated pursuit of the debtor's interest." *Bartenwerfer v. Buckley*, 143 S. Ct. 665, 675 (2023). Instead, it "balances multiple, often competing interests." *Id.* Namely, it also seeks to protect creditors by providing equitable distribution of a debtor's assets, limiting what debts are dischargeable and providing a "prompt and effectual administration and settlement of the debtor's estate." *Moses v. CashCall, Inc.*, 781 F.3d 63, 72 (4th Cir. 2015) (quoting *Katchen v. Landy*, 382 U.S. 323, 328 (1966)). And related to the goal of prompt and effectual administration, the Bankruptcy Code "centralize[s] disputes over the debtor's assets and obligations in one forum [to] protect[] both debtors and creditors from piecemeal litigation and conflicting judgments." *Id.* In other words, "ease and centrality of administration are [] foundational characteristics of bankruptcy law." *Id.*

Considering those objectives, Guthrie's state law claims create no obstacle to providing him with a fresh start. The claims, if successful, provide remedies for violating the discharge injunction—perhaps the central Bankruptcy Code feature allowing debtors a fresh start.

But as the Supreme Court has told us, the Bankruptcy Code is not solely to benefit debtors. The objectives pertaining to creditors must also be considered. Even so, it is not clear to us how allowing a debtor to pursue state-law remedies for violation of the discharge injunction stands as an obstacle to those objectives. Permitting Guthrie's state law claims

12

would not result in the inequitable distribution of his assets, would not increase the debts that are dischargeable and would not slow down or negatively affect the administration or settlement of his estate.

Perhaps the best argument that Guthrie's claims conflict with the purpose of the Bankruptcy Code is that they create "piecemeal litigation" and detract from the "centrality of administration" of bankruptcy law. However, Guthrie's claims are almost exclusively based on events which took place after the bankruptcy case was closed. And they are not inconsistent with, nor do they have any impact on, any order issued during the case. So, we cannot see how they detract from the ease or centrality with which the federal bankruptcy system operates.

Another potential argument in favor of obstacle preemption is that allowing Guthrie's state law claims would upset the balance the Bankruptcy Code struck as to the rights of debtors and creditors by allowing only contempt of court relief for violating the discharge injunction. And to be sure, comprehensive federal statutory or regulatory schemes may signal a balance of interests that preempts state law claims providing additional relief.

For example, in *Columbia Venture, LLC v. Dewberry & Davis, LLC*, we held that the National Flood Insurance Act ("NFIA") obstacle preempts claims against independent contractors hired by the Federal Emergency Management Agency ("FEMA"). 604 F.3d 824, 832 (4th Cir. 2010). FEMA hired Dewberry & Davis as an independent contractor to help remap the flood zones where Columbia Venture owned a large parcel of property. *Id.* at 827. Dewberry & Davis designated a large portion of Columbia Venture's property as

13

part of a floodway, greatly reducing the value of the property. *Id.* Columbia Venture sued Dewberry & Davis for professional malpractice, among other state law claims.

In holding that such state law claims were obstacle preempted by the NFIA, we explained that Congress passed the NFIA to make federally subsidized flood insurance available where private insurers were unwilling to offer insurance. *Id.* at 830. Critically, the NFIA lays out a comprehensive scheme for challenging FEMA flood-map determinations—a scheme that expressly limits both the grounds for appeal and the relief available. *Id.* at 831. Based on that scheme and the legislative history surrounding it, we reasoned that the NFIA's primary purpose was to "strike a balance between protecting property owners' right to appeal flood elevation determinations and the government's interest in minimizing the costs inherent in updating flood maps in order to provide flood insurance." *Id.* at 831. Thus, we held that allowing Columbia Venture's state law claims to go forward presented an obstacle to this balance.

At first blush, it might seem like we have a similar situation here. Guthrie's state law claims overlap closely with claims for violations of the Bankruptcy Code's discharge injunction. And the Code limits the relief available for such violations to contempt of court sanctions. But while *Columbia Venture* involved a comprehensive federal scheme for challenging flood map determinations, the Code's treatment of violations of the discharge injunction is scant at best. As the district court noted, there is no express provision addressing such violations. And while § 105 allows for contempt of court relief, it simply permits a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Since § 105(a) is

14

neither specific to discharge injunction violations nor comprehensive, it is not the type of Congressionally designed balance that implicates obstacle preemption.[11]

This case is closer to *College Loan Corp. v. SLM Corp.,* 396 F.3d 588 (4th Cir. 2005). There, we explained that the Higher Education Act ("HEA") did not preempt state law claims for breach of contract and tortious interference, even though those state law claims "rel[ied] in part on violations of the HEA or its regulations." *Id.* at 598–99.

The HEA created the Federal Family Education Loan Program ("FFELP"), which authorized consolidation loans. *Id.* at 590. College Loan Corporation sued Sallie Mae for breach of contract and tortious interference under state law, alleging violations of the FFELP regulations surrounding consolidation loans. *Id.* at 593. Sallie Mae moved to dismiss the claims, arguing that College Loan Corporation was impermissibly using its state claims to assert a private right of action not provided by the HEA. *Id.*

---

[11] Even a more comprehensive remedial scheme may not guarantee obstacle preemption. In *Anderson v. Sara Lee Corp.*, we explained that "the mere existence of a federal regulatory or enforcement scheme—even if the scheme is an appreciably detailed one—does not by itself imply preemption of state remedies." 508 F.3d 181, 193 (4th Cir. 2007) (cleaned up). While we held that the Fair Labor Standards Act ("FLSA") preempted state contract and tort claims for FLSA violations, we focused on the exclusivity of the FLSA's remedial scheme. *Id.* at 182. We concluded that "Congress manifested a desire to exclusively define the private remedies available to redress violations of the [FLSA's] terms [because] the FLSA mandates that the commencement of an action by the Secretary of Labor terminates an employee's own right of action." *Id.* at 194. And we explained that this was a "special feature of the FLSA's enforcement scheme [which] would be rendered superfluous if workers were able to circumvent that scheme while pursuing their FLSA rights." *Id.* The Bankruptcy Code contains no such special features manifesting Congress's desire for exclusivity.

Rather than focusing directly on Sallie Mae's private-cause-of-action argument, the district court turned to the related issue of preemption, finding "the HEA impliedly preempts any state law action that utilizes the HEA to satisfy an element of the state law claim." *Id.* It concluded that allowing the state law claims to go forward would pose an obstacle to Congress's objectives in enacting the HEA, which provided a "comprehensive administrative enforcement" scheme but not a private cause of action. *Id.* at 595–97.

We reversed, noting that the district court failed to explain "how the[] [statutory purposes of the HEA] would be compromised by a lender, such as College Loan, pursuing breach of contract or tort claims." *Id.* at 597. We concluded that neither the "existence of comprehensive federal regulations" nor the Secretary of Education's exclusive enforcement power over the HEA was sufficient to establish obstacle preemption. *Id.* at 598. We explained that "courts have generally authorized state tort claims to be pursued in areas where the federal government has regulated, even when such claims are in some manner premised on violations of federal regulations." *Id.* at 598–99. And we rejected the argument that the plaintiff's state law claims were "an impermissible effort to assert private rights of action" under a federal statute. *Id.* at 593. We explained that "the Supreme Court (and this Court as well) has recognized that the availability of a state law claim is even *more* important in an area where no federal private right of action exists." *Id.* at 599.

True, unlike in *College Loan Corp.*, the Bankruptcy Code provides remedies for violating the discharge injunction. While there is not a private cause of action for violating the injunction, a bankruptcy court may, under § 105, impose contempt of court sanctions. Admittedly, Guthrie's state law claims provide greater remedies than those available under

16

the Bankruptcy Code for the same conduct. Even so, we see no reason why the mere fact that state law claims provide broader remedies than federal law means the state claims are preempted. Unlike in *Columbia Venture*, there are not indications that Congress sought to limit remedies to facilitate a certain public-policy outcome.  Rather, the remedies Guthrie seeks further one of the primary goals of the Bankruptcy Code and the discharge injunction—a fresh start for debtors. And, as described above, they do not obstruct any other significant federal objective of the Bankruptcy Code.

2.

PHH argues that another congressional purpose is revealed in article I, section 8, clause 4 of the Constitution—which provides that Congress shall have the power to establish "uniform Laws on the subject of Bankruptcies throughout the United States." This Bankruptcy Clause, PHH argues, reflects that one Congressional purpose for the Bankruptcy Code must be uniformity. PHH says allowing each state's laws to be used to enforce a bankruptcy discharge stands as an obstacle to this constitutionally supported congressional purpose.

But this clause is not about ensuring uniformity in state laws whenever they happen to intersect with bankruptcy. It is about empowering Congress to enact bankruptcy laws and ensuring that federal bankruptcy laws themselves do not vary impermissibly from state to state. *See Siegel v. Fitzgerald,* 142 S. Ct. 1770, 1781 (2022) (describing the uniformity clause as a limitation on Congress's ability to enact bankruptcy laws that vary from state to state).

17

The Supreme Court has explained that state laws "on the subject of bankruptcies are suspended" if they conflict with federal bankruptcy law. *Butner v. United States*, 440 U.S. 48, 54 n.9 (1979). But the Court has also emphasized that preemption depends on an actual conflict, and not all state-levels differences frustrate the Constitution's uniformity principle. Congress even may structure bankruptcy law to incorporate those differences:

> Notwithstanding this requirement as to uniformity, the bankruptcy acts of Congress may recognize the laws of the state in certain particulars, although such recognition may lead to different results in different States. For example, the Bankruptcy Act recognizes and enforces the laws of the states affecting dower, exemptions, the validity of mortgages, priorities of payment and the like. Such recognition in the application of state laws does not affect the constitutionality of the Bankruptcy Act, although in these particulars the operation of the act is not alike in all the states.

*Id.* (citation omitted). Following the Supreme Court's guidance, the existence of the uniformity clause does not mean that Guthrie's state law claims contravene the purpose and intent of either article I, section 8, clause 4 of the Constitution or the Bankruptcy Code.

In sum, Guthrie's state law claims—which require, in part, proof that PHH violated a discharge injunction issued under the Bankruptcy Code—do not create an obstacle to the goals of the Bankruptcy Code. States are separate sovereigns that should have the freedom, at least generally, to create causes of action as they see fit. While preemption limits this freedom, we do not presume preemption. And we likewise should not "seek[] out conflicts between state and federal regulation where none clearly exists." *English v. Gen. Elec. Co.*,

18

496 U.S. 72, 90 (1990). Here there is no conflict. Thus, Guthrie's state law claims are not preempted.[12]

## B.

Having determined that conflict preemption does not bar Guthrie's state law claims, we next must determine whether Guthrie established a genuine dispute of material fact to survive summary judgment on his NCDCA, FCRA and TCPA claims.[13] We review a district court's grant of summary judgment de novo. *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021). A court may only grant summary judgment if there are no genuine disputes as to any material fact. *Id.* A fact is material if "proof of its existence or non-existence" would impact the outcome under the applicable law. *Id.* And a dispute is genuine if "the evidence offered is such that a reasonable jury might return a verdict for the non-movant." *Id.* We note that a court cannot base a grant of summary judgment merely on the belief "that the movant will prevail if the action is tried on the merits." *Id.* Rather, the standard requires the court to conclude that "the evidence could not permit a reasonable jury to return a favorable verdict" to the nonmovant. *Id.*

---

[12] Our colleague in dissent would affirm the district court on preemption. While we appreciate his thoughtful opinion, it would be more persuasive to us were we considering field preemption. But as already noted, PHH expressly disavowed field preemption and our decision today does not address the merits of that issue. Further, Guthrie disclaims any reliance on violations of the automatic stay, so we do not address whether such claims are preempted by the Bankruptcy Code.

[13] Because the district court made no determination as to the merits of Guthrie's NIED and IIED claims, we need not determine whether he has established a genuine dispute of material fact and remand these claims for further proceedings consistent with this opinion.

19

1.

Beginning with his NCDCA claim, the Act prohibits debt collectors from engaging in certain practices. N.C. Gen. Stat. §§ 75-50 to -56. Guthrie alleges that PHH violated this statute primarily by misrepresenting that he owed a debt when the debt had been discharged, in violation of § 75-54(4), which prohibits debt collectors from "falsely representing the creditor's rights." He also contends PHH violated the statute by contacting him directly after his attorney told PHH that he was represented by counsel, in violation of § 75-55(3), which prohibits debt collectors from "[c]ommunicating with a consumer (other than a statement of account used in the normal course of business) whenever the debt collector has been notified by the consumer's attorney that he represents said consumer."

In holding that—to the extent his claims were not otherwise preempted—there was no dispute of material fact, the district court found critical the fact that Guthrie remained on the deed to the Property. It noted that "surrender of property in bankruptcy 'does not serve to pass ownership of the residence to a lender; nor does it require the lender to foreclose its mortgage.'" J.A. 1608 (citing *In re Rose*, 512 B.R. 790, 793 (Bankr. W.D.N.C. 2014)). And because Guthrie and his former wife's names remained on the deed, the court noted that they were required "to maintain hazard insurance, pay taxes on the [P]roperty, and pay for maintenance and preservation of the Property." J.A.1609. Further, the district court pointed out that all letters sent to Guthrie "disclaimed any attempt to collect on a debt discharged in bankruptcy." J.A. 1609.

Based on those facts, the court held "it was not unconscionable or improper for [PHH] to contact [Guthrie], especially as all written communication contained a disclaimer

20

that, if the debt had been discharged in bankruptcy, the contact was for informational purposes only." J.A. 1609. Also, relying on our unpublished decision in *Lovegrove v. Ocwen Home Loans Servicing, L.L.C.*, 666 F. App'x 308 (4th Cir. 2016), it reasoned that including such disclaimer language in correspondence means that the correspondence is not considered an attempt to collect a debt. And the district court reasoned that the NCDCA did not prevent PHH from contacting Guthrie to try to reach his ex-wife Tonia, who had not filed for bankruptcy protection. Thus, the court determined, as a matter of law, that PHH's contacts with Guthrie did not violate the NCDCA.

We agree that the facts on which the district court relied support PHH's defenses. But that does not mean there are no genuine disputes of material fact as to the NCDCA claim. Take PHH's phone calls to Guthrie. Guthrie states that each time PHH called, it sought to collect the full amount of the loan from him, even if the caller also mentioned Tonia. And while the record contains but a few transcripts of those calls, none contain disclaimer language. Likewise, those same transcripts reveal that even when the caller stated he was attempting to reach Mark and Tonia Guthrie, once the caller confirmed he was speaking to Mark Guthrie, he explained he was calling about a loan balance that appears to be the full amount of the loan. We must construe the evidence in the light most favorable to Guthrie. And when we do that, a reasonable jury could conclude that PHH was attempting to collect a debt in a manner that violates § 75-54 by misrepresenting its right to collect the debt from Guthrie.

Guthrie also submitted evidence that on March 13, 2014, after receiving correspondence from his attorney, PHH recognized that he was represented by an attorney.

21

In fact, based on its knowledge that Guthrie was represented by counsel, PHH stated that "all communications including, verbal, mail, and email will be stopped. All correspondence, including monthly account statements, will be forwarded directly to your attorney." J.A. 757. Despite that, Guthrie proffered evidence that PHH called Guthrie directly after the March 2014 letter about the debt on the Property. Construing the evidence in the light most favorable to Guthrie, a reasonable jury could conclude that PHH violated § 75-55(3). As such, Guthrie has established a genuine dispute of material fact that PHH violated that provision of the NCDCA.[14]

2.

We next turn to Guthrie's FCRA claims. The FCRA imposes liability on "furnishers of information" for failing to reasonably investigate consumer disputes. 15 U.S.C. § 1681s-2. When a consumer initiates a dispute with a credit reporting agency, the credit reporting agency must notify the furnisher and the furnisher, in turn, must:

> (A) conduct an investigation with respect to the disputed information;
>
> (B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;
>
> (C) report the results of the investigation to the consumer reporting agency;
>
> (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and

---

[14] Mortgage statements with the disclaimer sent to Guthrie after March 2014 would likely be considered "a statement of account used in the normal course of business" and thus not give rise to a NCDCA violation under § 75-55(3). *See* J.A. 775–979.

22

> (E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly--
>> (i) modify that item of information;
>> (ii) delete that item of information; or
>> (iii) permanently block the reporting of that item of information.

15 U.S.C. § 1681s-2(b)(1).

The "FCRA imposes liability for negligent noncompliance with the Act, and it allows for enhanced penalties for willful violations." *Dalton v. Cap. Ass'd Indus., Inc.*, 257 F.3d 409, 417 (4th Cir. 2001). For negligent violations of this requirement, a consumer is entitled to "any actual damages sustained . . . as a result of the [information furnisher's] failure[.]" 15 U.S.C. § 1681o(a)(1). For willful violations, a consumer may also seek punitive damages and, instead of actual damages, may seek statutorily defined damages between $100 and $1,000 per violation. *Id.* § 1681n(a).

Guthrie's complaint alleges both negligent and willful violations of the FCRA. The district court determined there was no genuine dispute of material fact for either basis of liability. With respect to his negligent violation claim, the district court ruled that Guthrie failed to demonstrate actual damages traceable to any failure on the part of PHH. And with respect to his willful violation claim, the district court ruled that nothing in the record could "support a reasonable juror in concluding [PHH] knowingly and intentionally acted in conscious disregard of [Guthrie's] rights." J.A. 1615.

a.

In ruling on Guthrie's negligence claim, the district court divided Guthrie's alleged actual damages into three general categories: (i) denials of credit, (ii) emotional and

23

medical damages, and (iii) professional damages. All three represent actionable damages under the FCRA. *Sloane v. Equifax Info. Servs., LLC,* 510 F.3d 495, 500 (4th Cir. 2007) ("Actual damages [under the FCRA] may include not only economic damages, but also damages for humiliation and mental distress."). But the district court held either that Guthrie failed to prove the existence of these damages or that he failed to prove the damages were attributable to PHH's actions. We address each of these categories.

i.

In his complaint, Guthrie alleged a violation of the FCRA based on PHH's alleged failure to reasonably respond to disputes submitted to credit reporting agencies TransUnion, Experian and Equifax in early 2019. And he alleged two credit denials that occurred due to those failures—one from SunTrust and one from Navy Federal. Despite that, the district court found that Guthrie's credit denials did not result from any failure on PHH's part to reasonably investigate a credit dispute.

We agree with the district court's dismissal of the claims related to the disputes submitted to Experian and Equifax.[15] But there exists a genuine dispute of material fact as to Guthrie's dispute submitted to TransUnion. In granting summary judgment, the district court relied on PHH's representative testimony that PHH responded to Guthrie's dispute

---

[15] The court dismissed the claim regarding Equifax because the record reflected that PHH never received notice of Guthrie's dispute filed with Equifax. Because PHH did not receive notice of this dispute, there was no requirement that it conduct a reasonable investigation. And as to the Experian dispute, the district court found that Guthrie's credit denials occurred before PHH responded to the dispute and, as such, could not have occurred due to PHH's actions.

to TransUnion by reporting his discharged loan was current with $0 past due. And it is true that this response appears to have fixed the incorrect reporting issue for some of the later months of 2018. But Guthrie introduced evidence that PHH's response to his dispute did not rectify all major errors in his credit report. Following PHH's response, his credit report continued to show a delinquent balance from May 2016 to August 2018. And since he had complied with his obligations under the bankruptcy plan, he had no delinquent status at that time. Guthrie also introduced evidence that SunTrust Bank denied his application for credit for the following reasons: "[s]erious delinquency," "[l]ength of time since account not paid as agreed," "[p]roportion of loan balances to loan amounts is too high," and "[a]mount past due on accounts." J.A. 1004.

PHH's evidence did not clearly establish that its response addressed any errors in past delinquency. While it may have responded to inaccuracies in Guthrie's credit report as to whether he was currently delinquent, the FCRA requires creditors to also determine whether information they have provided in the past is inaccurate. *Saunders v. Branch Banking & Tr. Co. of VA*, 526 F.3d 142, 148 (4th Cir. 2008). And a credit report is inaccurate if it "provides information in such a manner as to create a materially misleading impression." *Id.* Construing this evidence in the light most favorable to Guthrie, a reasonable jury could conclude that PHH failed to appropriately respond to errors showing

25

a delinquent balance for prior reporting periods. Thus, Guthrie created a genuine dispute of material fact as to whether this failure led to Guthrie's credit denial from SunTrust.[16]

Guthrie also appeals the district court's order granting summary judgment on his FCRA claims based on credit disputes initiated in 2015 and 2018. He argues he provided evidence of those disputes during discovery. The district court held that Guthrie could not "identify additional disputes" to base his FCRA claim on at the summary judgment stage without amending his complaint. J.A. 1612.

Guthrie argues that under the standard of notice pleading, he need only provide a "short and plain statement" of his claim. Fed. R. Civ. P. 8. And it is true that it would have been sufficient for Guthrie to state in his complaint that he had initiated credit disputes, without providing detailed information on when those disputes occurred. However, "although notice pleading does not require a plaintiff to plead particulars, 'if a plaintiff chooses to do so, and they show that he has no claim, then he is out of luck.'" *Bender v. Suburban Hosp., Inc.*, 159 F.3d 186, 192 (4th Cir. 1998); *E.E.O.C. v. Browning Ferris, Inc.*, 225 F.3d 653 (4th Cir. 2000) (unpublished table decision). Guthrie does not argue that he moved to amend his complaint. And without doing that, we find no error in the district court's order granting summary judgment on the 2015 and 2018 credit disputes.

---

[16] As part of its summary-judgment pleadings, PHH submitted what appears to be a database entry capturing correspondence between TransUnion and PHH regarding Guthrie's 2019 dispute. *See* J.A. 357. While this largely inscrutable document appears to support the testimony of PHH's representative, the parties have not explained or contextualized the document, and it is unclear if the district court relied on it. At this stage, we are unwilling to say, as a matter of law, that PHH's response was not the cause of Guthrie's SunTrust denial.

ii.

The district court next rejected Guthrie's alleged emotional and medical damages, explaining that he relied "only on his own affidavit to establish the existence of his emotional damages" and provided no evidence from a medical provider that his physical or mental symptoms were caused or exacerbated by PHH's actions. J.A. 1613–14. While the district court noted that Guthrie's own testimony could support damages for emotional distress, it held that his "conclusory and vague statements regarding his emotional state are insufficient at [the summary judgment] stage of the proceeding." J.A. 1614.

The district court correctly noted that to support damages for emotional distress, a plaintiff must "reasonably and sufficiently explain the circumstances of the injury and not resort to mere conclusory statements." *Sloane*, 510 F.3d at 503 (cleaned up). Stated differently, the testimony must "sufficiently articulate true demonstrable emotional distress." *Id.* (cleaned up).

To illustrate this requirement, we describe two cases. In *Sloane*, we found the following evidence to be "substantial, if not overwhelming, objective evidence support[ing] an emotional distress award" in the FCRA context. *Id.* at 504. The plaintiff (1) provided "an objective and inherently reasonable 'factual context' for her resulting claims of emotional distress," (2) "offered 'sufficiently articulated' descriptions of her protracted anxiety through detailed testimony of specific events and the humiliation and anger she experienced," (3) "provided evidence that the distress was apparent to others," (4) provided "substantial trial evidence attest[ing] to the direct 'nexus'" between defendant's violations and her distress, (5) her emotional distress "manifested itself in

27

terms of physical symptoms, particularly insomnia," and (6) she provided evidence that the stress impacted her marriage. *Id.* at 503.

In contrast, in *Doe v. Chao,* 306 F.3d 170 (4th Cir. 2002), *aff'd*, 540 U.S. 614 (2004), we reached a different result. There, the plaintiff offered testimony that as a result of the defendant's conduct, he felt "greatly concerned and worried" and was "torn to pieces." *Id*. at 181. But he conceded he did not seek any medical or psychological treatment or medication. *Id*. He likewise offered no testimony about any impact of the defendant's conduct on his behavior or physical consequences of defendant's conduct. *Id*. We held this evidence failed to create a genuine dispute of material fact as to emotional distress damages. *Id*.

The evidence offered by Guthrie is much more like the evidence presented in *Sloane* than that presented in *Doe*. While it is true that Guthrie has not provided corroborating evidence from medical professionals for his alleged anxiety resulting from PHH's actions, Guthrie has alleged more than "conclusory statements" about his emotional distress. He testified that he began having chest pains in 2018 and has been to the emergency room several times. He specified symptoms he attributes to PHH's conduct—high blood pressure, a general feeling of being on edge, being overly worrisome, having an elevated heart rate, experiencing a lack of sleep and waking up in the middle of the night gasping for air. *Id.* He also testified that he is seeing a psychologist. *Id.* He attributes his anxiety and stress to PHH's collection attempts and testified that he is not allowed to fly at his job based on his anxiety diagnosis. *Id.*

28

While perhaps not as "overwhelming" as the evidence in *Sloane*, we find that Guthrie has asserted more than "conclusory statements" and has sufficiently articulated demonstrable emotional distress. And he has presented an "objective and inherently reasonable 'factual context' for [his] resulting claims of emotional distress." *Sloane*, 510 F.3d at 504. In sum, there exists a genuine dispute of material fact for the jury on the issue of emotional distress.

### iii.

The district court also ruled that Guthrie failed to establish professional damages attributable to PHH. Guthrie's alleged professional damages related to his Top Secret/Sensitive Compartmented Information (TS/SCI) security clearance required for his job. J.A. 588. In May 2019, a government contractor conducted a routine scan of Guthrie's credit reports and discovered delinquent debt owed to PHH from a TransUnion credit report. As a result, in November 2019, the Department of Defense requested information about the delinquency from Guthrie within 30 days. Guthrie alleges that he did not receive the request for information until early January 2020 because it was sent to his prior duty station rather than his current duty station.

The Department of Defense paused Guthrie's security clearance on January 17, 2020, when it issued a "No Determination Made" adjudication as to his delinquent account. J.A. 599. As a result, Guthrie testified that his "job duties were ground to a virtual halt." J.A. 742. On February 5, 2020, shortly after Guthrie filed his complaint, his security clearance was reinstated.

The district court held that the record did not support that "the information [Guthrie's employer] inquired about" was related to credit disputes. J.A. 1614. But the record shows that the delinquent debt owed to PHH, which was found on a TransUnion credit report, caused the investigation into Guthrie's security clearance.

Further, the district court also reasoned that Guthrie "did not lose his security clearance, [] received no demotion or discipline, and his pay was not docked" because of the investigation. J.A. 1614. True. But his security clearance was paused, preventing him from performing his job duties.[17] And Guthrie alleges professional embarrassment because of having to explain why he was unable to participate in his job duties while his clearance was paused, which qualifies as actionable damages under the FCRA. *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 239 (4th Cir. 2009) ("Actual damages [under the FCRA] may include . . . damages for humiliation and mental distress."). While a jury might reject this argument, it is nonetheless a cognizable damage category under the FCRA. Thus, there is a genuine dispute of material fact as to Guthrie's professional damages.

b.

Turning to Guthrie's claim for a willful violation, the district court ruled that to succeed on such a claim, Guthrie was required to show that PHH "knowingly and intentionally committed an act in conscious disregard" of his rights. J.A. 1614. (citing

---

[17] PHH argued below that if Guthrie had responded to the request for information within the requested 30-day period, his clearance may not have been paused. Maybe so. But there was not conclusive evidence on this point. And since the investigation occurred due to an outstanding PHH loan balance, there is still a genuine dispute of material fact on this point.

*Dalton*, 257 F.3d at 418). While noting that summary judgment is typically not appropriate on whether a defendant acted with a particular state of mind, the court nonetheless held that nothing in the record supported that PHH acted with a knowing and intentional disregard of Guthrie's rights.

But in *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007), the Supreme Court clarified that a defendant can also willfully violate the FCRA by acting with "reckless disregard" of its statutory duty. *Id*. at 71. And we find that the record—considering Guthrie's repeated attempts to inform PHH of his bankruptcy rights and years-long effort to correct his credit reports through formal disputes—establishes a genuine dispute of material fact as to whether PHH acted with reckless disregard of its duty.

In sum, Guthrie has established a genuine dispute of material fact as to both his claims for a negligent violation of the FCRA and a willful violation of the FCRA.

3.

Lastly, we affirm the district court's holding that there exists no genuine dispute of material fact with respect to Guthrie's TCPA claim.

The TCPA governs the usage of "automatic telephone dialing system[s]." 47 U.S.C § 227. The Supreme Court has clarified that, "[t]o qualify as an 'automatic telephone dialing system,' a device must have the capacity to either store a telephone number using a random or sequential generator or to produce a telephone number using a random or sequential number generator." *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1167 (2021).

Guthrie's sole evidence that PHH used an automatic telephone dialing system to contact him comes from his own testimony, in which he states that two callers from PHH

31

told him they used an "auto dialer" to reach him. However, in response, a PHH representative testified that "PHH never used a random or sequential number generator to generate and then dial a telephone number when calling Plaintiff or any other individual in connection with the Loan." J.A. 1638. And the evidence offered by Guthrie failed to create a genuine issue of material fact that references to "auto dialer" referred to an "automatic telephone dialing system."

Guthrie has provided no evidence that PHH used an "automatic telephone dialing system" as defined in the TCPA. So, even construing the evidence in his favor, a reasonable jury could not conclude that PHH violated the TCPA. Thus, we affirm the district court's summary judgment on this claim.

## III.

As explained above, we hold that the Bankruptcy Code does not preempt Guthrie's state law claims arising from alleged improper collection attempts of a discharged debt. We also hold that Guthrie has established a genuine dispute of material fact with respect to his NCDCA and FCRA claims. However, he has failed to establish a genuine dispute of material fact with respec to his TCPA claim. As such, the district court's order granting summary judgment to PHH is

*AFFIRMED IN PART, VACATED IN PART AND REMANDED.*

32

WYNN, Circuit Judge, concurring in part and dissenting in part:

In my view, Mark Guthrie's remaining state-law claims, to the extent they are premised on a violation of the automatic stay or discharge injunction issued by the bankruptcy court, are preempted by the Bankruptcy Code. While it is true that we do not lightly infer preemption, Majority Op. at 8, 18, several aspects of the Code establish that it was Congress's intent to preempt these types of claims. *See Anderson v. Sara Lee Corp.*, 508 F.3d 181, 192 (4th Cir. 2007) (noting that congressional purpose is the "ultimate touchstone" of preemption analysis (citation omitted)).[1]

One is the comprehensive and particularly federal nature of bankruptcy law. The Constitution grants Congress the express power to enact "uniform Laws on the subject of Bankruptcies." U.S. Const. art. I, § 8, cl. 4. And it has. "Congress has wielded [its bankruptcy] power by creating comprehensive regulations on the subject and by vesting exclusive jurisdiction over bankruptcy matters in the federal district courts." *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 425 (6th Cir. 2000) (citing 28 U.S.C. § 1334(a)). The Bankruptcy Code is incredibly detailed, "provid[ing] a comprehensive federal system of penalties and protections to govern the orderly conduct of debtors' affairs and creditors' rights." *E. Equip. & Servs. Corp. v. Factory Point Nat'l Bank*, 236 F.3d 117, 120 (2d Cir. 2001) (per curiam). In these enactments, Congress has attempted to balance the competing

---

[1] Like the parties and the majority opinion, Majority Op. at 9–10, I analyze this issue through the lens of conflict preemption.

aims of giving the debtor a "fresh start" while protecting creditors' rights to repayment. *Moses v. CashCall, Inc.*, 781 F.3d 63, 72 (4th Cir. 2015).

Two provisions of the Code are relevant here: those governing the automatic stay and the discharge injunction. After Guthrie filed his Chapter 13 bankruptcy petition, all claims against his assets were automatically stayed pending resolution of the bankruptcy proceeding. *See* 11 U.S.C. § 362(a). Then, Guthrie having complied with the terms his Chapter 13 plan, the bankruptcy court entered a discharge order relieving Guthrie of personal liability on the discharged debts and preventing his creditors from any attempt to collect on such debts. *See id.* § 524(a).

Now, Guthrie seeks to use state law to remedy a supposed violation of that discharge injunction. Although we have not addressed the question, our sister circuits appear to be unanimous in holding that state-law claims alleging violations of the *automatic-stay* provision of the Code are preempted. *See E. Equip.*, 236 F.3d at 121 (2d Cir.) ("Courts that have examined this issue have held that the federal Bankruptcy Code preempts any state law claims for a violation of the automatic stay . . . . Any relief for a violation of the stay must be sought in the Bankruptcy Court."); *Pertuso*, 233 F.3d at 425–26 (6th Cir.); *MSR Expl., Ltd. v. Meridian Oil, Inc.*, 74 F.3d 910, 911 (9th Cir. 1996).[2]

---

[2] The majority does not expressly address whether state-law claims alleging violations of the automatic stay are preempted, although it is possible its analysis may be different in that case. *See* Majority Op. at 11 n.9. Although the parties have focused primarily on the question of preemption and the discharge injunction, Guthrie's complaint alleges violations that occurred during the automatic stay as well, and at oral argument Guthrie's counsel refused to limit the allegations to just post-discharge conduct by PHH, saying he complained of "both" pre- and post-discharge conduct. Oral Arg. at 1:15–1:25,

I see no reason why state-law claims alleging violations of a discharge injunction should be treated differently. As one leading bankruptcy authority has stated, the discharge injunction is "broad," prohibiting "not only legal proceedings, but also *any* other acts to collect a discharged debt as a personal liability of the debtor." 4 Collier on Bankruptcy ¶ 524.02 (Richard Levin & Henry J. Summer eds., 16th ed.) (emphasis added). As with any injunction, a bankruptcy court enjoys the usual contempt authority to remedy a violation. *See id.* ("[T]he discharge injunction is the equivalent of a court order. Therefore, a violation of the injunction may be sanctioned as contempt of court."); *In re Walters*, 868 F.2d 665, 669 (4th Cir. 1989) (explaining that bankruptcy court "has authority to issue any order necessary or appropriate to carry out the provisions of the bankruptcy code," including contempt); *Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 445 (1st Cir. 2000) (observing that bankruptcy courts "have appropriately used their statutory contempt power to order monetary relief . . . when creditors have engaged in conduct that violates" the discharge injunction), *amended on denial of reh'g* (Dec. 15, 2000). Indeed, a contempt proceeding is the "normal sanction" for violations of the discharge injunction. Collier, *supra*, at ¶ 524.02.

This wasn't always the case. Before 1970, a bankruptcy court's discharge order merely provided the debtor with an affirmative defense if he was later sued by the holder of a discharged debt. The apparent practice was for a creditor to sue in state court to collect on a discharged debt, and if the debtor, relying on the discharge, failed to respond, a default

---

*available at* https://www.ca4.uscourts.gov/OAarchive/mp3/22-1248-20230504.mp3. For the reasons given, I would find Guthrie's state-law claims, to the extent they are premised on a violation of either the automatic stay or discharge injunction, preempted.

judgment was entered against him. *See Cox v. Zale Del., Inc.*, 239 F.3d 910, 915 (7th Cir. 2001); Collier, *supra*, at ¶ 524.LH (tracing this history).

But in 1970, Congress amended the Code to enjoin any such collection attempts. *See* An Act to Amend the Bankruptcy Act, Pub. L. No. 91-467, § 3, 84 Stat. 990, 991 (1970) (codified as amended at 11 U.S.C. § 524(a)). The change was debtor-protecting, a goal it advanced by actively prohibiting *any* attempt to collect on a discharged debt and by funneling disputes over discharges back into the bankruptcy courts. In other words, Congress chose to give the discharge order the force of an injunction, replete with the traditional contempt remedy. This choice, I believe, is highly instructive as to congressional intent on the available remedies for violations of the discharge order.

The majority argues that because Guthrie's bankruptcy case has been closed since 2016, his state-law claims will not present any great obstacle to the orderly administration of the underlying bankruptcy proceeding. *See* Majority Op. at 13. But although a bankruptcy case may be closed, that does not mean it is closed for good, and the Code envisions situations in which there can be a dispute post-discharge. For example, a bankruptcy proceeding can be reopened, *see* 11 U.S.C. § 350(b); a debtor can elect to make voluntary payments even on a discharged debt, *see id.* § 524(f); *In re Boyd*, 562 B.R. 324, 329 (Bankr. W.D. Va. 2016) (in contempt proceeding sanctioning creditor's violation of discharge injunction, holding that debtor may not recover certain mortgage payments voluntarily made post-discharge); and there can be a dispute over whether a particular debt was even discharged, *see, e.g.*, *In re Johnston*, No. 05-6288, 2007 WL 3166941, at *3–7

36

(Bankr. N.D. W. Va. Oct. 25, 2007) (in contempt proceeding alleging violation of discharge injunction, analyzing whether creditor received notice of a discharged debt).

The last scenario is especially illustrative. Imagine a situation in which a creditor attempted to collect on a debt that the creditor did not realize was discharged in Guthrie's bankruptcy, and Guthrie filed the same action alleging a violation of the North Carolina Debt Collection Act. Adjudication of that claim in a North Carolina state court would undoubtedly stand as an obstacle to what we have referred to as "a principal purpose" of the Code: "centraliz[ing] disputes over the debtor's assets and obligations in one forum." *Moses*, 781 F.3d at 72; *see MSR Expl.*, 74 F.3d at 914 (noting that "disputes over discharge" brought as state tort claims "might gravely affect the already complicated processes of the bankruptcy court").

Here, Guthrie's remaining state-law claims are expressly premised on PHH's alleged failure to acknowledge the effect of his discharge. For example, he complains of PHH's "refusal or inability to acknowledge that the Discharge excused [him] from paying any amount in connection with the Loan" and of PHH's "continued refusal to recognize the legal effect of the Discharge." J.A. 59, 61.[3]

Such claims clearly "presuppose" a violation of the Bankruptcy Code. *Pertuso*, 233 F.3d at 426. That is, as the district court correctly observed, PHH's actions are only allegedly unlawful under state law *because of* the discharge—but for the discharge, PHH

---

[3] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

37

would be entitled to attempt to collect on its debt via the calls and letters that Guthrie says are unlawful.

This is important, because to resolve such claims, a state court would necessarily have to wade into the underlying bankruptcy proceeding, including determining which debts were discharged. That may be straightforward in this case, but it may not be in others. In any event, I do not believe Congress—concerned as it was under the Code with centralizing a debtor's bankruptcy into a single, federal forum—would wish for state courts to adjudicate such matters. Accordingly, in a case like this where the debtor seeks to enforce his discharge injunction via state-law claims, I believe the state claims are preempted and the proper remedy is a contempt proceeding in the bankruptcy court.

Indeed, Guthrie enjoyed the protections and benefits of the bankruptcy system, including the discharge of his debts and a court-issued injunction barring his creditors from attempting to collect on those debts. To the extent he now believes that PHH has violated that injunction by attempting to unlawfully collect on discharged debts, he is not without recourse. His remedy is a contempt proceeding in the same court that oversaw his bankruptcy, where he would be eligible for traditional damages and attorneys' fees. *See* J.A. 135 (Guthrie's discharge order stating "[c]reditors who violate this order can be required to pay debtor[']s damages and attorney's fees").

A contempt remedy has the practical advantage of "placing responsibility for enforcing the discharge order in the court that issued it," *Cox*, 239 F.3d at 916, and keeps state courts from wading into potentially thorny issues of bankruptcy law. More importantly, this approach reflects Congress's intent that a contempt proceeding be the sole

38

remedy for violations of the discharge injunction. Permitting state-law causes of action to redress purported violations of the injunction would "undermine the uniformity the Code endeavors to preserve" and "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Pertuso*, 233 F.3d at 426 (cleaned up).

Accordingly, because I believe that Guthrie's state-law claims, to the extent they are premised on a violation of the automatic stay or discharge injunction, are preempted by the Bankruptcy Code, I respectfully dissent as to those parts of the majority opinion holding otherwise.[4]

---

[4] I concur in the remainder of the opinion, including the majority's holding that there is a genuine dispute of material fact to survive summary judgment as to Guthrie's North Carolina Debt Collection Act claim (to the extent it is not preempted) and federal Fair Credit Reporting Act claim, but that there is no genuine dispute and the district court properly granted PHH summary judgment on Guthrie's federal Telephone Consumer Protection Act claim.

39