**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 21-2170**

———————

JUST PUPPIES, INC., d/b/a Just Puppies Towson; JUST PUPPIES OF MARYLAND INC., d/b/a Just Puppies Rockville; CHARM CITY PUPPIES, LLC, d/b/a Charm City Puppies & Boutique; SOBRAD, LLC, d/b/a Pinnacle Pet; TARA BAKER, d/b/a Valley View Kennel,

　　　　　　　Plaintiffs – Appellants,

　　　　v.

ANTHONY G. BROWN,

　　　　　　　Defendant – Appellee.

------------------------

THE HUMANE SOCIETY OF THE UNITED STATES,

　　　　　　　Amicus Supporting Appellee.

———————

Appeal from the United States District Court for the District of Maryland, at Baltimore. Ellen Lipton Hollander, Senior District Judge.  (1:21-cv-01281-ELH)

———————

Argued:  October 27, 2022　　　　　　　　Decided:  December 11, 2024

———————

Before KING and RUSHING, Circuit Judges, and TRAXLER, Senior Circuit Judge.

———————

Affirmed by published opinion.  Judge Rushing wrote the opinion, in which Judge King and Senior Judge Traxler joined.

———————

**ARGUED:** Meagan Cooper Borgerson, KAGAN STERN MARINELLO & BEARD, LLC, Annapolis, Maryland, for Appellants.  Ryan Robert Dietrich, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellee.  **ON BRIEF:** Jonathan P. Kagan, KAGAN STERN MARINELLO & BEARD, LLC, Annapolis, Maryland, for Appellants.  Brian E. Frosh, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellee.  Ralph Henry, Jessica Meltzer, THE HUMANE SOCIETY OF THE UNITED STATES, Washington, D.C., for Amicus Curiae.

─────────────

RUSHING, Circuit Judge:

The plaintiffs in this case want to sell dogs through physical retail stores in Maryland. But a Maryland law restricts their ability to do so. The plaintiffs sued, alleging the Maryland statute is preempted by the federal Animal Welfare Act and violates the Commerce Clause of the United States Constitution. The district court dismissed plaintiffs' complaint, concluding they failed to state plausible claims. We affirm.

## I.

## A.

Over the past twelve years, Maryland has passed an evolving series of laws designed to stop the sale of dogs bred in so-called "puppy mills."[1] The earliest laws required retail pet stores to source the dogs they sold from breeders and brokers who were licensed by the U.S. Department of Agriculture (USDA) and in compliance with applicable federal laws and USDA regulations. Later iterations banned retail pet stores from selling dogs altogether.

The law at issue here is Maryland's 2021 retail pet store statute. *See* An Act Concerning Domestic Animals – Retail Pet Stores & the Task Force to Study Canine Breeding Facilities & Sourcing Standards, 2021 Md. Laws, Ch. 448 (2021) (codified at Md. Code Ann., Bus. Reg. §§ 19-701–19-705) (hereinafter, Pet Store Statute). The Pet

---

[1] According to plaintiffs, the accepted definition of a "puppy mill" is "a dog-breeding operation, which offers dogs for monetary compensation or remuneration, in which the physical, psychological and/or behavioral needs of the dogs are not being fulfilled due to inadequate housing, shelter, staffing, nutrition, socialization, sanitation, exercise, veterinary care, and/or inappropriate breeding." J.A. 24.

3

Store Statute contains a straightforward prohibition: "A retail pet store may not sell or otherwise transfer or dispose of cats or dogs."[2]  Md. Code Ann., Bus. Reg. § 19-703(a).  A "retail pet store" is "a for-profit establishment that sells or offers for sale domestic animals to be kept as household pets" or "a broker."  *Id.* § 19-701(f)(1).  A "broker" is any "person who transfers dogs or cats for resale by another person."  *Id.* § 19-701(e).  The Pet Store Statute, however, essentially excludes breeders from its prohibitions, at least when breeders sell animals at the location where they were born.  The statute defines a breeder as "a person who breeds or raises dogs or cats to sell, exchange, or otherwise transfer to the public."  *Id.* § 19-701(d).  It then provides that the term "'[r]etail pet store' does not include an establishment at which the animals sold at the establishment were born at the establishment."  *Id.* § 19-701(f)(2).

Practically speaking, the Pet Store Statute allows breeders to sell dogs in Maryland, both in person and over the internet, but prohibits retail pet stores and brokers from selling dogs.  According to plaintiffs, the law "effectively shift[s] the sale of puppies from regulated retail pet stores (who source puppies from regulated out-of-state breeders and

---

[2] The Pet Store Statute does not forbid "a retail pet store from collaborating with an animal welfare organization or animal control unit to offer space for these entities to showcase cats or dogs for adoption."  Md. Code Ann., Bus. Reg. § 19-703(b); *see id.* § 19-702 ("This subtitle does not apply to an animal welfare organization or animal control unit operating within a retail pet store.").  An "animal welfare organization" is a 26 U.S.C. § 501(c)(3) nonprofit "whose mission and practice is the rescue of animals and the placement of those animals in permanent homes."  *Id.* § 19-701(c)(1).  The term "does not include an organization that obtains animals from a breeder or broker in exchange for payment or compensation."  *Id.* § 19-701(c)(2).

brokers) to Maryland breeders and unregulated marketplaces, such as on the internet, and [to] unregulated nonprofit animal welfare organizations, rescues, and shelters." J.A. 39.

B.

Plaintiffs are parties affected by Maryland's retail pet store laws. Just Puppies, Inc., Just Puppies of Maryland, Inc., and Charm City Puppies, LLC, are retail pet stores in Maryland whose business models are premised primarily on offering dogs for sale to Maryland consumers. Each of these businesses has historically derived more than ninety percent of its gross revenue from dog sales and the remainder from selling pet accessories. These businesses generated millions of dollars annually by buying high-end, pure-bred puppies, primarily from out of state, and reselling them to Maryland consumers. Sobrad, LLC, is a Missouri corporation and USDA-licensed dog broker that sources dogs for retail pet stores, including for Charm City Puppies. Tara Baker is a USDA-licensed dog breeder based in Missouri. In the past, she has sold nearly all her puppies to Just Puppies.

In May 2021, plaintiffs initiated this lawsuit challenging the Pet Store Statute.[3] As relevant here, plaintiffs alleged that the Pet Store Statute is preempted by the federal

---

[3] In an earlier lawsuit, the Just Puppies stores, Charm City Puppies, Sobrad, and a retail pet store and breeder not parties to this case sued to challenge a 2018 Maryland pet store statute. The district court dismissed the complaint and denied the plaintiffs' motion for a preliminary injunction. *See Just Puppies, Inc. v. Frosh*, 438 F. Supp. 3d 448 (D. Md. 2020). The Maryland General Assembly enacted the 2021 Pet Store Statute while plaintiffs' appeal from that dismissal was pending. On the parties' motion, we vacated the district court's judgment and remanded for further consideration in light of the amendments made in the 2021 statute. *See Just Puppies, Inc. v. Frosh*, No. 20-1631, 2021 WL 4452349 (4th Cir. Apr. 29, 2021). Plaintiffs then filed the present lawsuit challenging the 2021 Pet Store Statute. When the district court dismissed plaintiffs' complaint in this case, it entered a similar order in the remanded case. *See* Mem. Op., *Just Puppies, Inc. v. Frosh*, No. 1:19-

5

Animal Welfare Act (AWA), 7 U.S.C. § 2131 *et seq.* (Count 1), and violates the Commerce

Clause of the Constitution (Counts 2 and 4).  The Maryland Attorney General moved to

dismiss the complaint for failure to state a claim.  *See* Fed. R. Civ. P. 12(b)(6).  The district

court granted the motion and dismissed plaintiffs' complaint on all counts.[4]  *See Just*

*Puppies, Inc. v. Frosh*, 565 F. Supp. 3d 665 (D. Md. 2021).  Plaintiffs appealed, and we

have jurisdiction under 28 U.S.C. § 1291.

## II.

"We review de novo a district court's dismissal of a complaint pursuant to Rule

12(b)(6)."  *Holloway v. Maryland*, 32 F.4th 293, 298 (4th Cir. 2022).  "[A] complaint must

contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible

on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

In evaluating a complaint's sufficiency, we construe the allegations and all reasonable

inferences drawn therefrom in the light most favorable to the nonmoving party.  *See Nemet*

*Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009).  However,

we need not accept as true "legal conclusions drawn from the facts" or any other

---

cv-02439-ELH (D. Md. Sept. 17, 2021), ECF No. 78.  The plaintiffs again appealed, and we placed that case in abeyance pending a decision in the instant appeal.  *See* Order, *Just Puppies, Inc. v. Frosh*, No. 21-2169 (4th Cir. Dec. 2, 2021), ECF No. 16.

[4] The district court also denied plaintiffs' motion for a preliminary injunction. Plaintiffs have waived appellate review of that ruling and the district court's dismissal of Counts 3, 5, 6, and 7 of their complaint by failing to offer any substantive argument on those matters in their briefs.  *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to develop its argument—even if its brief takes a passing shot at the issue." (internal quotation marks and brackets omitted)).

"unwarranted inferences, unreasonable conclusions, or arguments." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (internal quotation marks omitted). In addition to the complaint, we may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). We may also consider documents "attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

### III.

We begin with plaintiffs' contention that the district court erred by dismissing Count 1, in which they allege that the federal Animal Welfare Act preempts Maryland's Pet Store Statute.[5] The Supremacy Clause of the Constitution establishes that federal law is "the supreme Law of the Land . . . , any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Accordingly, federal law preempts claims under state law that are contrary to or interfere with federal law. *See Guthrie v. PHH Mortgage Corp.*, 79 F.4th 328, 336 (4th Cir. 2023).

"Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). This presumption makes the most sense when, as here, "Congress legislates 'in a field which the States have traditionally occupied.'" *S. Blasting Servs., Inc. v. Wilkes County*, 288 F.3d 584, 590 (4th Cir. 2002) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470,

---

[5] Only Baker and Sobrad bring the preemption claim in Count 1.

485 (1996)). Regulating animals—and specifically, dogs—has long been considered to "fall[] within the police powers of the several states." *Sentell v. New Orleans & C. R. Co.*, 166 U.S. 698, 702 (1897); *see also Nicchia v. State of New York*, 254 U.S. 228, 230–231 (1920); *Lunon v. Botsford*, 946 F.3d 425, 430 (8th Cir. 2019); *N.Y. Pet Welfare Ass'n, Inc. v. City of New York*, 850 F.3d 79, 89 (2d Cir. 2017); *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1183 (10th Cir. 2009); *DeHart v. Town of Austin*, 39 F.3d 718, 722 (7th Cir. 1994).

Nevertheless, this assumption can be overcome in several ways. First, Congress may expressly preempt certain state laws. Second, "'federal law may so thoroughly occupy a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Guthrie*, 79 F.4th at 336 (quoting *S. Blasting Servs.*, 288 F.3d at 590 (brackets omitted)). Third, compliance with both federal and state law may be "'a physical impossibility,'" resulting in a direct conflict. *S. Blasting Servs.*, 288 F.3d at 589 (quoting *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985)). Or state law may "'stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" creating another circumstance in which the Supreme Court has found preemption warranted. *Hillsborough*, 471 U.S. at 713 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

In every case, Congress's purpose for the federal law is the "ultimate touchstone." *Medtronic*, 518 U.S. at 485 (internal quotation marks omitted). And "Congress expresses its intentions through statutory text passed by both Houses and signed by the President (or passed over a Presidential veto)." *Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2496

8

(2022). Accordingly, "the text of a law controls over purported legislative intentions unmoored from any statutory text," and we "may not replace the actual text with speculation as to Congress' intent." *Id.* (internal quotation marks omitted); *see Kansas v. Garcia*, 140 S. Ct. 791, 804 (2020) ("[A]ll preemption arguments[] must be grounded in the text and structure of the statute at issue." (internal quotation marks omitted)).

Plaintiffs contend that the Animal Welfare Act preempts the Pet Store Statute as a matter of field and obstacle preemption. We address each in turn.

## A.

Field preemption refers to the "rare case[]" in which Congress intends for federal law to exclusively govern a particular subject. *Garcia*, 140 S. Ct. at 804; *see also English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990); *Cox v. Duke Energy, Inc.*, 876 F.3d 625, 635 (4th Cir. 2017). We can infer that intent when "Congress has legislated so comprehensively that it has left no room for supplementary state legislation." *R.J. Reynolds Tobacco Co. v. Durham Cnty.*, 479 U.S. 130, 140 (1986); *see Garcia*, 140 S. Ct. at 804; *Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288, 1297 (2016).

In the Animal Welfare Act (AWA), Congress authorized the Secretary of Agriculture to promulgate minimum standards for "the humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors." 7 U.S.C. § 2143(a)(1). Pursuant to the AWA, the Secretary issues licenses to dealers and exhibitors, without which they cannot "buy, sell, offer to buy or sell, transport or offer for transportation" any animals. *Id.* § 2134; *see also id.* § 2133. Dog breeders and brokers are subject to this USDA licensing regime.

9

Importantly, however, the AWA expressly contemplates state and local regulation on the same subject.  For example, Congress clarified that the Secretary's authority to set animal welfare standards "shall not prohibit any State (or a political subdivision of such State) from promulgating standards in addition to those standards promulgated by the Secretary."  *Id.* § 2143(a)(8).  Congress also authorized the Secretary "to cooperate with the officials of the various States or political subdivisions thereof in carrying out the purposes of [the AWA] and of any State, local, or municipal legislation or ordinance on the same subject."  *Id.* § 2145(b).

The AWA's acknowledgement of concurrent state and local animal welfare regulation demonstrates that Congress did not intend for the AWA to occupy the field of animal welfare or sales to the exclusion of state law.  *See DeHart*, 39 F.3d at 722 (concluding the AWA "does not evince an intent to preempt state or local regulation of animal or public welfare" because it "expressly contemplates state and local regulation of animals").  We therefore reject plaintiffs' field preemption argument.

B.

Next, we consider plaintiffs' allegation that the Pet Store Statute poses an impermissible obstacle to achieving the purposes and objectives of the AWA.  This argument faces an uphill climb.  As previously noted, animal regulation is within the States' traditional police powers, and in the AWA Congress "indicated its awareness of the operation of state law" in the field of animal welfare and sales.  *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 167 (1989).  This recognition suggests Congress has "decided to stand by" the operation of both federal and state law in this area "and to

10

tolerate whatever tension" arises as the AWA and state laws operate in tandem. *Id.* (internal quotation marks omitted).

We follow a two-step process to assess whether a state law "stands as an obstacle" to federal law. *S. Blasting Servs.*, 288 F.3d at 590 (internal quotation marks omitted). "First, we determine Congress's significant objectives in passing the federal law." *Guthrie*, 79 F.4th at 338 (internal quotation marks omitted). Then we inquire whether the state law "stands as an obstacle to the accomplishment" of those significant federal objectives. *Id.* (internal quotation marks omitted).

The AWA includes a congressional statement of policy. We reproduce it in full here:

> The Congress finds that animals and activities which are regulated under this chapter are either in interstate or foreign commerce or substantially affect such commerce or the free flow thereof, and that regulation of animals and activities as provided in this chapter is necessary to prevent and eliminate burdens upon such commerce and to effectively regulate such commerce, in order—
>
> > (1) to insure that animals intended for use in research facilities or for exhibition purposes or for use as pets are provided humane care and treatment;
> >
> > (2) to assure the humane treatment of animals during transportation in commerce; and
> >
> > (3) to protect the owners of animals from the theft of their animals by preventing the sale or use of animals which have been stolen.
>
> The Congress further finds that it is essential to regulate, as provided in this chapter, the transportation, purchase, sale, housing, care, handling, and treatment of animals by carriers or by persons or organizations engaged in using them for research or experimental purposes or for exhibition purposes or holding them for sale as pets or for any such purpose or use.

11

7 U.S.C. § 2131. In short, the purpose of the AWA is to foster the humane treatment of animals intended for use as pets or for research or exhibition purposes and to protect their owners from theft.

To advance this policy, Congress created a federal system of licensing, registration, recordkeeping, and inspections for certain persons and entities that breed, sell, transport, or use animals, including dealers, research facilities, and exhibitors. *See, e.g.*, 7 U.S.C. §§ 2133–2134, 2140, 2142–2143. Congress also authorized the Secretary to promulgate standards "govern[ing] the humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors." *Id.* § 2143(a). Under the AWA's definitions, breeders and brokers are generally "dealers." *See id.* § 2132(f). The AWA regulates dealers by creating "a system of compulsory registration designed to require dealers to provide information that would facilitate the Act's objective of creating a nationwide system of animal welfare inspections." *N.Y. Pet Welfare Ass'n*, 850 F.3d at 87. Most retail pet stores, including those like the plaintiff stores in this case that only sell dogs as pets, are not considered "dealers" under the AWA and are excluded from licensure. *See* 7 U.S.C. § 2132(f) (explaining that "dealer" "does not include a retail pet store (other than a retail pet store which sells any animals to a research facility, an exhibitor, or another dealer)"); *id.* § 2132(h) (excluding retail pet stores from the definition of "exhibitor"); 9 C.F.R. § 2.1(a)(3)(i) (exempting retail pet stores "from the licensing requirements under section 2 or section 3 of the Act"); *see also id.* § 1.1 (defining "retail pet store").

Plaintiffs primarily contend that Congress intended "to prevent and eliminate burdens on commerce for the purchase and sale of dogs" and the Pet Store Statute imposes

12

such a burden by prohibiting retail pet stores from selling dogs. Opening Br. 31. They emphasize the references to "commerce," "purchase," and "sale" in Section 2131's congressional statement of policy. According to plaintiffs, by prohibiting certain dog sales, the Pet Store Statute burdens commerce, creating the very kind of problem Congress sought to remedy.

We disagree. Regulating commerce was Congress's constitutional basis for exercising its power to enact the AWA. *See* U.S. Const. art. I, § 8, cl. 3. Taking Section 2131 as a whole, the interstate commerce burden Congress sought to alleviate was a burden created by the inhumane treatment of animals. Section 2131 does not evince an intention to eliminate every burden on interstate commerce possibly related to animal sales. *See N.Y. Pet Welfare Ass'n*, 850 F.3d at 89 (rejecting the idea "that the AWA's regulations grant animal dealers a federal right to engage in any line of business they wish without state interference"); *Stark v. Rutheford*, 442 F. Supp. 3d 1084, 1089 (S.D. Ind. 2020) ("The AWA simply does not provide an unqualified right to USDA license holders to buy, retain, or sell animals . . . without complying with applicable state regulations.").

At bottom, plaintiffs' argument is that because Congress regulated the treatment of animals bred for commercial sale, Congress must want to ensure such sales continue. But the text of Section 2131 presupposes the existence of commercial activity to be regulated. In other words, the AWA regulates the humane treatment of certain animals to the extent a market exists for their sale. It does not compel the existence of a market for such sales or guarantee a particular market structure.

13

Secondarily, plaintiffs argue that the AWA circumscribes how States may regulate animal welfare and "does not give [S]tates authority" to ban the sale of dogs by retail pet stores and brokers. Opening Br. 21. As plaintiffs explain, Section 2143(a)(1) authorizes the Secretary to "promulgate standards to govern the humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors." 7 U.S.C. § 2143(a)(1). Section 2143(a)(8) clarifies that subsection (a)(1) "shall not prohibit any State (or a political subdivision of such State) from promulgating standards in addition to those standards promulgated by the Secretary." *Id.* § 2143(a)(8). Plaintiffs contend that Section 2143(a)(8) restricts state and local governments to legislating only in those areas in which the Secretary may regulate. As the argument goes, because the Secretary may regulate only the handling, care, treatment, and transportation of animals by certain entities, state and local governments are similarly limited. And the Pet Store Statute therefore runs afoul of Section 2143(a)(8) by prohibiting a form of sale rather than regulating one of the enumerated categories.

Again, we disagree. States are independent sovereigns in our federal system; they do not need Congress's permission to exercise their historic police powers. By enacting the AWA, Congress intruded into an area traditionally regulated by the States and declined to occupy the entire field. Section 2143(a)(1) limits the extent of that intrusion by restricting the Secretary's regulatory authority to the handling, care, treatment, and

14

transportation of animals by certain entities.[6]  *Cf. N.Y. Pet Welfare Ass'n*, 850 F.3d at 89 (reasoning that the Secretary "may preempt only to the extent that Congress has delegated him the power to do so").  It does not purport to constrict the scope of state and local governments' legislative authority.  As to the areas in which the Secretary may regulate, Section 2143(a)(8) clarifies that the Secretary's regulations are a floor: the AWA does not prohibit state and local governments from adopting additional standards.  And Section 2143's silence on other kinds of state and local regulations leaves them unaddressed.[7]  *See GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1645 (2020) ("[I]n general, a matter not covered is to be treated as not covered . . . ." (internal quotation marks omitted)).

Finally, plaintiffs allege in their complaint that the Pet Store Statute "blurs" definitional lines that the AWA draws between breeders, brokers, and stores and "eradicate[s] USDA licensed brokers" from the Maryland market.  J.A. 58.  But plaintiffs have not plausibly alleged that these effects of the Pet Store Statute pose an obstacle to the

---

[6] That Section 2143 authorizes the Secretary to promulgate standards for "dealers, research facilities, and exhibitors," terms which often exclude retail pet stores, only bolsters our conclusion.  7 U.S.C. § 2143(a)(1).

[7] We are similarly unpersuaded by plaintiffs' reliance on *Puppies 'N Love v. City of Phoenix*, 116 F. Supp. 3d 971 (D. Ariz. 2015), *vacated*, 283 F. Supp. 3d 815 (D. Ariz. 2017).  There, a district court upheld a city ordinance that prevented pet shops from selling dogs obtained from commercial breeders.  Plaintiffs pluck part of the district court's Commerce Clause analysis out of context and repurpose it for their preemption argument.  But the transplant doesn't work because the district court there was resolving whether the AWA "clearly and unambiguously authorize[d] Phoenix to enact an ordinance that discriminates against interstate commerce."  *Id.* at 983.  Here, the presumption is flipped: Maryland may authoritatively regulate a matter of traditional state concern unless Congress has clearly demonstrated intent to preempt state law.  *See Medtronic*, 518 U.S. at 485.

AWA's system of licensing and inspections. Plaintiffs do not allege that any entity is prevented from applying for, obtaining, or complying with a USDA license. True, the Pet Store Statute may mean plaintiffs cannot engage in certain economic activity in Maryland in the manner they hoped their USDA licenses would facilitate. But the Pet Store Statute poses no obstacle to getting, maintaining, or complying with those licenses. Thus, plaintiffs' obstacle preemption argument fails. *See N.Y. Pet Welfare Ass'n*, 850 F.3d at 88–89 (rejecting preemption argument where "[b]reeders and distributors' ability to sell to City pet shops ha[d] no bearing on the licensing scheme's ability to facilitate federal enforcement activities" because regulated entities still had to "get licenses," "provide information to federal officials," and be subject to federal inspection, and exempt breeders were still excluded from licensing).

## IV.

We turn next to the district court's dismissal of Counts 2 and 4 of plaintiffs' complaint, in which they allege that the Pet Store Statute violates the Commerce Clause of the Constitution. The Commerce Clause empowers Congress to "regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. "Although by its terms the clause speaks only of congressional authority, 'the Supreme Court long has recognized that it also limits the power of the States to erect barriers against interstate trade.'" *Colon Health Ctrs. of Am., LLC v. Hazel*, 813 F.3d 145, 151 (4th Cir. 2016) (brackets omitted) (quoting *Dennis v. Higgins*, 498 U.S. 439, 446 (1991)). This "dormant" aspect of the Commerce Clause "prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *New Energy Co. of Ind.*

16

*v. Limbach*, 486 U.S. 269, 273–274 (1988); *Nat'l Pork Producers Council v. Ross*, 143 S. Ct. 1142, 1153 (2023) (calling this "antidiscrimination principle" the "very core" of the dormant Commerce Clause (internal quotation marks omitted)).

A.

In Count 2, plaintiffs allege that, although the Pet Store Statute is facially neutral, it discriminates against out-of-state breeders and brokers in purpose and effect.[8]  A state law that discriminates against interstate commerce can be sustained under the dormant Commerce Clause only upon "a showing that the State has no other means to advance a legitimate local purpose."  *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338–339 (2007); *see also Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2461 (2019).

"Discrimination" in this context means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Sys., Inc. v. Dep't of Env't Quality*, 511 U.S. 93, 99 (1994).  "The principal focus of inquiry" is "the practical operation of the statute, since the validity of state laws must be judged chiefly in terms of their probable effects." *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 37 (1980); *see also Comptroller of the Treasury v. Wynne*, 575 U.S. 542, 561 n.4 (2015) ("The Commerce Clause regulates effects, not motives . . . .").  However, when evaluating whether state legislation constitutes economic protectionism, we may consider

---

[8] Only Baker and Sobrad bring the dormant Commerce Clause claim in Count 2.

17

a discriminatory purpose as well as discriminatory effects. *See Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270–271 (1984); *Hazel*, 813 F.3d at 152.

Plaintiffs acknowledge that the Pet Store Statute does not prohibit out-of-state breeders and brokers from selling dogs to Maryland consumers, but they allege that changes wrought by the statute discriminate in practical effect. As plaintiffs see it, before the Pet Store Statute, an out-of-state breeder or broker could sell dogs to Maryland consumers within the State through what plaintiffs call "face-to-face" transactions, in which a consumer can view the dog before making a purchase. Breeders and brokers conducted this desirable form of transaction through in-state retail pet stores. But after the Pet Store Statute forbade retail pet stores in Maryland from selling dogs, it became almost impossible for out-of-state breeders and brokers to sell their dogs within Maryland's borders through face-to-face purchases. In-state breeders, meanwhile, can continue selling dogs to consumers in Maryland directly from their establishments; they do not need a retail storefront to reach Maryland consumers in face-to-face transactions. *See* Md. Code Ann., Bus. Reg. § 19-701(f)(2) ("'Retail pet store' does not include an establishment at which the animals sold at the establishment were born at the establishment.").

Plaintiffs do not dispute, however, that just like in-state breeders, out-of-state breeders can sell their dogs in face-to-face transactions with Maryland consumers who visit their establishments. In other words, a Marylander can travel to another State to purchase a puppy directly from a breeder and then bring that out-of-state dog into Maryland. The same goes for a face-to-face purchase from an out-of-state broker (or out-of-state retail pet store). Plaintiffs also do not dispute that out-of-state breeders can sell their dogs directly

18

to consumers in Maryland over the internet and then ship the animal into the State. And

plaintiffs acknowledge that the Pet Store Statute prohibits both in-state and out-of-state

brokers from operating in Maryland.

This state of affairs cannot be said to discriminate against interstate commerce. The

Pet Store Statute "does not prohibit the flow of interstate goods, place added costs upon

them, or distinguish between in-state and out-of-state companies" in the market. *Exxon

Corp. v. Governor of Maryland*, 437 U.S. 117, 126 (1978). Nor does the law in practice

"treat persons from out-of-state any differently than persons in-state." *Brown v. Hovatter*,

561 F.3d 357, 364 (4th Cir. 2009). Breeders, whether in-state or out-of-state, can sell their

dogs directly to Maryland consumers at their establishment or over the internet. Brokers,

whether in-state or out-of-state, cannot sell dogs in Maryland.[9] And the statute does not in

any way regulate dog sales occurring wholly in other States, whether through retail stores,

brokers, or breeders.[10]

---

[9] The apparent dearth of USDA-licensed brokers in Maryland does not make the statute discriminatory. *See* Opening Br. 42 (representing that plaintiffs "are unaware of any USDA-licensed brokers of dogs in Maryland"). After all, a state law is not "'discriminatory because it will apply most often to out-of-state entities' in a market that has more out-of-state than in-state participants." *N.Y. Pet Welfare Ass'n*, 850 F.3d at 91 (quoting *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 88 (1987)).

[10] Plaintiffs' argument based in the "principle against extraterritoriality" therefore fails. *Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664, 667 (4th Cir. 2018) (describing this principle as "derived from the notion that a State may not regulate commerce occurring wholly outside of its borders" (internal quotation marks omitted)); *but see Nat'l Pork Producers Council*, 143 S. Ct. at 1153–1157 (casting doubt on the vitality of an "extraterritorial effects" principle).

The Pet Store Statute does eliminate plaintiffs' preferred mode of doing business in Maryland—the retail pet store and broker models—but that alone is not a cognizable dormant Commerce Clause harm. As the Supreme Court has explained, the Commerce Clause protects interstate commerce, not a "particular structure or method[] of operation in a retail market." *Exxon Corp.*, 437 U.S. at 127; *see also Nat'l Pork Producers Council*, 143 S. Ct. at 1162 (plurality opinion) (same); *Brown*, 561 F.3d at 364 (explaining the dormant Commerce Clause "does not purport to . . . protect" market participants' "chosen way of doing business").

Relatedly, plaintiffs allege that travel and shipping expenses associated with the direct-sale business model required by the Pet Store Statute will substantially increase the cost of doing business in Maryland for out-of-state breeders. But their examples of increased cost are premised on purchasing dogs from far-away States like Missouri, where Baker lives, rather than nearby States like Virginia or Pennsylvania. "The cost of doing business in many markets is higher for faraway sellers than for nearby ones," but that fact alone does not condemn a state law under the Commerce Clause. *N.Y. Pet Welfare Ass'n*, 850 F.3d at 91; *see also Minerva Dairy, Inc. v. Harsdorf*, 905 F.3d 1047, 1060 (7th Cir. 2018) (reasoning that a discriminatory effect on "long-distance commerce" due to the "geographical fact[s] of life" did not constitute impermissible discrimination against out-of-state commerce). Moreover, harm to "particular interstate firms" does not establish a discriminatory effect on "the interstate market" itself, which is the dormant Commerce Clause's concern. *Exxon Corp.*, 437 U.S. at 127–128; *see also Colon Health Centers of Am. v. Hazel*, 733 F.3d 535, 543 (4th Cir. 2013) ("[A] court should focus on discrimination

20

against *interstate commerce*—not merely discrimination against the specific parties before it.").

Plaintiffs hypothesize that the Pet Store Statute will discriminate in effect by shifting business to Maryland sellers to the detriment of out-of-state breeders.[11]  But even under Rule 12(b)(6)'s favorable standard, plaintiffs have not plausibly alleged that Maryland consumers will turn to in-state breeders instead of those outside Maryland.  As the district court noted, Maryland borders Virginia, West Virginia, Delaware, Pennsylvania, and the District of Columbia and is very close to New Jersey.  Maryland residents "who seek 'nearby' breeders are just as likely to find them in those [S]tates as in Maryland." *Just Puppies*, 565 F. Supp. 3d at 719 (quoting *Park Pet Shop, Inc. v. City of Chicago*, 872 F.3d 495, 503 (7th Cir. 2017)).  Plaintiffs do not plausibly allege why Maryland consumers are more likely to seek out Maryland breeders than nearby breeders in neighboring States when the Pet Store Statute does not preference or incentivize in-state sales.  *See Park Pet Shop*, 872 F.3d at 502–503 (reasoning that an ordinance that "may confer a competitive advantage on breeders that are not too distant from Chicago" was not discriminatory in

---

[11] In their complaint, plaintiffs allege that, although rescues and shelters offer pet adoptions instead of sales, they charge adoption fees that generate millions of dollars in annual revenue.  On appeal, plaintiffs do not pursue an argument that the Pet Store Statute will shift business away from interstate sellers to local rescues and shelters, which they claim have "limited inventory."  J.A. 48.  However, to the extent plaintiffs allege that rescues and shelters source dogs from outside of Maryland, *see* J.A. 54, a shift of business to these entities would present a "shift from one interstate supplier to another," which does not implicate the dormant Commerce Clause. *Exxon Corp.*, 437 U.S. at 127; *see Nat'l Pork Producers Council*, 143 S. Ct. at 1161 (plurality opinion) (confirming that "shift[ing] market share from one set of out-of-state firms . . . to another" does not impermissibly burden interstate commerce).

21

effect because "those breeders are as likely to be located in nearby Wisconsin or Indiana as they are in suburban Chicago or downstate Illinois").

What's more, plaintiffs' allegations suggest that consumers lack suitable in-state options for purchasing dogs. They aver that "[t]he demand for puppies by Maryland consumers generally exceed[ed] the supply that retail pet stores [were] able to obtain from out-of-state breeders," J.A. 43, rescues and shelters have "limited inventory" of the kinds of dogs Maryland consumers want, J.A. 48, and "only one" USDA-licensed breeder (i.e., breeder with more than four breeding females) sells dogs to the public in Maryland, Opening Br. 17. In short, plaintiffs' complaint does not support an inference that the "probable effect[]" of the Pet Store Statute will be to drive business to Maryland sellers and away from out-of-state breeders. *Hazel*, 813 F.3d at 152 (internal quotation marks omitted).

As for discriminatory purpose, we agree with the district court that plaintiffs have not plausibly alleged that the Maryland General Assembly enacted the Pet Store Statute with intent to discriminate against out-of-state economic interests. To support their claim, plaintiffs quote statements in the legislative history from the bill's sponsor, Maryland State Senator Ben Kramer. In a committee hearing, Kramer said: "[Y]ou'll notice that no small breeder, no responsible breeder has sent you written opposition or is providing oral opposition. We are talking [in this bill about] these big out of state breeders who sell by the thousands that are here in opposition." J.A. 62. Kramer added: "This [bill] deals with the out-of-state massive corporations that are just literally by the thousands turning over puppies every year and sourcing through puppy mills." J.A. 62–63. In the same committee

22

hearing, Kramer explained that under the Pet Store Statute, "you can buy from any breeder that you choose regardless of size, scale, you know, certainly our small businesses, our local business I'm guessing will hopefully benefit . . . . [O]ur local economy and our mom-and-pop businesses benefit." J.A. 63. Plaintiffs allege that Kramer's statements show that the Pet Store Statute "was intentionally designed to discriminate against interstate commerce by interfering with the free flow of dogs from out-of-state breeders and brokers to Maryland consumers through retail pet stores." J.A. 63.

Our review of the legislative history attached to the complaint, however, confirms the district court's conclusion that plaintiffs took Senator Kramer's comments out of context. During the same hearing on which plaintiffs rely, Kramer also stated, for example: "There is nothing that would restrict your ability, if you found a responsible breeder in Pennsylvania, Massachusetts, or California from selling you a [] puppy and you'll still be able to do that." J.A. 423. He went on to say that nothing prevented consumers "from buying [a puppy] from [an out-of-state breeder and] having it shipped here." J.A. 424. And just before he discussed the bill's putative benefits for mom-and-pop businesses, Kramer commented that "if there's a big Missouri puppy mill and you decided they've got a puppy you want, you'll still be able to buy directly from them. They can ship to you." J.A. 431.

A broader look at the history of the Pet Store Statute and its predecessor law reveals the Maryland General Assembly's concern over puppy mills, its desire to hamper puppy mills' ability to sell dogs in Maryland, and its desire to protect Maryland consumers from purchasing unhealthy dogs. Plaintiffs acknowledge this in their complaint, recognizing

23

that "[t]he purported purpose behind the 2018 [pet store law] was to eradicate so-called 'puppy mills,'" "reduce the number of animals in shelters," and "protect[] consumers from purchasing unhealthy animals." J.A. 71–72. The Pet Store Statute was an extension of the 2018 law and its goals. Plaintiffs' attempt to undercut those purposes by quoting Senator Kramer out of context does not plausibly allege that the Maryland General Assembly's purpose in enacting the Pet Store Statute was to discriminate against out-of-state economic interests.

The district court was correct to dismiss Count 2 because plaintiffs failed to plausibly allege that the Pet Store Statute impermissibly discriminates against interstate commerce in purpose or effect.

B.

In Count 4, plaintiffs allege that even if the Pet Store Statute does not discriminate against out-of-state economic interests in purpose or effect, it nonetheless violates the Commerce Clause because it flunks the balancing test the Supreme Court articulated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).[12]

Under *Pike*, "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Id.* at 142; *see Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337–338 (2008). The Supreme Court has recently cautioned against "overstat[ing] the

---

[12] All five plaintiffs brought the dormant Commerce Clause claim in Count 4.

extent to which *Pike* and its progeny depart from the antidiscrimination rule" at the core of the dormant Commerce Clause. *Nat'l Pork Producers Council*, 143 S. Ct. at 1157. Even so, the Court "has left the courtroom door open to challenges premised on . . . nondiscriminatory burdens," while simultaneously warning that *Pike* has never been applied to "prevent a State from regulating the sale of an ordinary consumer good within its own borders on nondiscriminatory terms." *Id.* at 1158, 1165 (internal quotation marks omitted).

To survive *Pike* balancing, a statute "must be reasonably tailored" but "need not be perfectly tailored." *Yamaha Motor Corp. v. Jim's Motorcycle, Inc.*, 401 F.3d 560, 569 (4th Cir. 2005). The "extent of the burden" on interstate commerce that will be tolerated "depend[s] on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Pike*, 397 U.S. at 142. We "proceed with deference to the state legislature" when assessing the law's putative benefits and consider only "whether the legislature had a rational basis for believing there was a legitimate purpose that would be advanced by the statute." *Yamaha Motor Corp.*, 401 F.3d at 569. Analyzing the law's burdens "requires closer examination," especially "when the burdens fall predominantly on out-of-state interests." *Id.* Although state laws "frequently survive" *Pike* scrutiny, *Davis*, 553 U.S. at 339, "[t]he fact-intensive character of this inquiry . . . counsels against a premature dismissal," *Hazel*, 733 F.3d at 546.

Plaintiffs contend the district court prematurely dismissed Count 4, but we disagree. Because plaintiffs failed to "plead facts 'plausibly' suggesting a substantial harm to interstate commerce" or that the legislature lacked a rational basis to believe the Pet Store

25

Statute advanced a legitimate purpose, dismissal—not discovery—was warranted. *Nat'l Pork Producers Council*, 143 S. Ct. at 1162 (plurality opinion) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

To start, the Maryland General Assembly articulated legitimate purposes for the Pet Store Statute. Plaintiffs acknowledge that the legislature hoped to "eradicate so-called 'puppy mills,'" "reduce the number of animals in shelters," and "protect[] consumers from purchasing unhealthy animals." J.A. 71–72. But plaintiffs allege that these purported benefits are illusory because the General Assembly lacked sufficient evidence from which to conclude that retail pet stores contributed to these problems or that the Pet Store Statute's prohibition would achieve the legislature's goals. Yet the General Assembly, or one of its committees, heard testimony about the dangers of puppy mills and their negative effects on Maryland consumers, that retail pet stores and brokers sold pets sourced from puppy mills, and that problems plague USDA licensing and enforcement. It also heard contrary testimony. The legislature thus had a rational basis for the Pet Store Statute and acted within the legislative purview by hearing conflicting information about a problem and choosing among possible solutions. The judicial branch is ill-suited "to 'second-guess the[se] empirical judgments of lawmakers concerning the utility of legislation'" and must "giv[e] due deference to the body whose primary responsibility it is to judge the benefits and burdens of" legislative action. *Hazel*, 813 F.3d at 156 (quoting *CTS Corp.*, 481 U.S. at 92).

Further, plaintiffs failed to plausibly allege that the Pet Store Statute substantially burdens interstate commerce, much less that its burdens are "clearly excessive" in

26

comparison to its benefits. *Pike*, 397 U.S. at 142. In support, plaintiffs repeat the harms they alleged with respect to Count 2, and for similar reasons we find those allegations insufficient. Under the Pet Store Statute, out-of-state breeders and brokers can still sell directly to Maryland consumers. *See supra*, at 18. And although the Pet Store Statute may put some retail pet stores in Maryland out of business, "the dormant Commerce Clause does not protect a 'particular structure or metho[d] of operation.'" *Nat'l Pork Producers Council*, 143 S. Ct. at 1162 (plurality opinion) (quoting *Exxon Corp.*, 437 U.S. at 127). Finally, plaintiffs' allegations suggest the statute actually may drive Maryland consumers to out-of-state sellers, like breeders in States that border Maryland, thus conferring an interstate benefit. *See supra*, at 21; *see also* J.A. 77 (alleging that the statute will "increase internet sales" and "increase importation of out-of-state and internationally sourced dogs from unknown and unregulated sources"). Plaintiffs' arguments about whether the Pet Store Statute represents sound policy are irrelevant to the constitutional analysis. We therefore affirm the district court's dismissal of Count 4.

V.

The district court correctly held that Maryland's Pet Store Statute is not preempted by the federal Animal Welfare Act and does not violate the Constitution's Commerce Clause. Accordingly, the judgment of the district court is

*AFFIRMED.*

27